UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CIV-20541-ALTONAGA
    (05-CR-20874-ALTONAGA)
MAGISTRATE JUDGE P.A. WHITE

GUY PHILIPPE,

    Movant,

v.                                          REPORT OF
                                    MAGISTRATE JUDGE

UNITED STATES OF AMERICA,

    Respondent.

_____/

## I. INTRODUCTION

This matter is before the court on Movant's pro se motion to vacate, filed pursuant to 28 U.S.C. § 2255, which attacks the constitutionality of his conviction and sentence for one count of conspiracy to launder monetary instruments pursuant to 18 U.S.C. § 1956(h). Judgment for these offenses was entered, following a guilty plea, in case no. **05-cv-20874-Altonaga.**

This case has been referred to the undersigned for consideration and report. (DE#2).[1] The undersigned reviewed the entire record in this case, as well as the relevant records from the underlying criminal case.[2] After conducting an evidentiary hearing and reviewing the record in its entirety, the undersigned has concluded that the motion should be denied.

---

[1] The citation format "DE#()"refers to docket entries in this section 2255 case. By contrast, the citation format "Cr-DE#()" refers to docket entries in the underlying federal criminal case. If a colon follows a docket entry number, the subsequent numbers function as pincites.

[2] Courts may consider "the record of prior proceedings" to rule on a section 2255 motion. See Rule 4(b), Rules Governing Section 2255 Proceedings. See also 28 U.S.C. § 2255(b) (explaining that courts must review "the files and records of the case").

## IV.   __Standard of Review__

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to §2255 are extremely limited. A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. See 28 U.S.C. § 2255(a); McKay v. United States, 657 F. 3d 1190, 1194 n.8 (11th Cir. 2011). "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" Lynn v. United States, 365 F. 3d 1225, 1232 (11th Cir. 2004)(citations omitted).

The Eleventh Circuit promulgated a two-part inquiry that a district court must consider before determining whether a movant's claim is cognizable. First, a district court must find that "a defendant assert[ed] all available claims on direct appeal." United States v. Frady, 456 U.S. 152, 152 (1982); McCoy v. United States, 266 F. 3d 1245, 1258 (11th Cir. 2001); Mills v. United States, 36 F. 3d 1052, 1055 (11th Cir. 1994). Second, a district court must consider whether the type of relief the movant seeks is appropriate under Section 2255. This is because "[r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." Lynn, 365 F.3d at 1232-33 (quoting Richards v. United States, 837 F. 2d 965, 966 (11th Cir. 1988)(internal quotations omitted)).

If a court finds a claim under Section 2255 to be valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him/her or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255. To obtain this relief on collateral review, a petitioner must "clear a significantly higher hurdle than would exist on direct appeal." Frady, 456 U.S. at 166 (rejecting the plain error standard as not sufficiently deferential to a final judgment).

Under Section 2255, unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schiro v. Landrigan, 550 U.S. 465, 474 (2007). See also Aron v. United States, 291 F. 3d 708, 715 (11th Cir. 2002)(explaining that no evidentiary hearing is needed when a petitioner's claims are "affirmatively contradicted by the record" or "patently frivolous"). As indicated by the discussion below, the motion and the files and records of the case conclusively show that movant is entitled to no relief, therefore, no evidentiary hearing is warranted.

In addition, the party challenging the sentence has the burden of showing that it is unreasonable in light of the record and the § 3553(a) factors. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). The Eleventh Circuit recognizes "that there is a range of reasonable sentences from which the district court may choose," and ordinarily expect a sentence within the defendant's advisory guideline range to be reasonable. Id.

## IV.   **Timeliness**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") created a limitation for a motion to vacate. Pursuant to 28 U.S.C. § 2255(f), as amended on April 24, 1996, a one-year period of limitations applies to a motion under the section. The one-year period runs from the latest of:

> (1) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (2) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the movant is prevented from filing by such governmental action;
>
> (3) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). See also Bousley v. United States, 523 U.S. 614, 619-22 (1998) (providing that new substantive constitutional rule apples retroactively on collateral review, finding that the issue there was the product of statutory interpretation and not constitutional determinations that place particular conduct covered by a statute beyond the State's power to punish); Pruitt v. United States, 274 F. 3d 1315, 1317 (11th Cir. 2001). The burden of demonstrating that the AEDPA's one-year limitation period was sufficiently tolled, whether statutorily or equitably, rests with

the movant. See, e.g., Pace v. Diguglielmo, 544 U.S. 408, 418
(2005) (applying this principle in a section 2254 context); Brown
v. United States, 318 Fed. App'x 749, 750 (11th Cir. 2008)
(applying this principle in a section 2255 context).

Pursuant to 28 U.S.C. § 2255(f)(1), Movant was required to
file his section 2255 motion within one year from the time the
judgment of conviction became final. Although the terms "judgment
of conviction" and "final" are not defined in § 2255(f), the
Eleventh Circuit has consistently stated that a "judgment of
conviction becomes final when the time for seeking that review
expires." Murphy v. United States, 634 F. 3d 1303, 1307 (11th Cir.
2011).

As Movant did not file a notice of appeal to pursue a direct
appeal of his conviction and sentence, Movant's opportunity to seek
review expired fourteen days after the judgment was entered. See
Fed. R. App. P. 4(b)(1)(A) (requiring a notice of appeal to be
filed fourteen days from the date of the judgment in a criminal
case). Judgement was entered on June 22, 2017. (Cr-DE#72). As such,
after calculating fourteen days from that date, Movant's judgment
of conviction became **final on July 6, 2017.**

Movant had one year from the time his conviction became
"final" within which to timely file this initial collateral
proceeding under § 2255(f)(1). Thus, to be timely, this filing
should have been filed no later than **July 6, 2018.** See Downs v.
McNeil, 520 F. 3d 1311, 1318 (11th Cir. 2008)(citing Ferreira v.
Sec'y, Dep't of Corr., 494 F. 3d 1286, 1289 n.1 (11th Cir.
2007)(explaining this Court has suggested that the limitations
period should be calculated according to the "anniversary method,"
under which the limitations period expires on the anniversary of

the date it began to run)). The initial pro se motion to vacate was filed on **February 12, 2018.** Thus, the motion to vacate was timely filed.

## V. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

### A. <u>Factual Background</u>

The following facts come from the factual proffer Movant signed it when pleading guilty. Movant stated during his plea colloquy that: (1) he signed it; (2) he read it in its entirety before signing it; (3) his attorney explained it to him before he signed it; (4) he understood everything his attorney told him about it before he signed it; and (5) everything set forth in it is truthful and accurate. (Cr-DE#76:14-16). Accordingly, the underlying facts are as follows:

> Beginning in the late 1990s, cocaine was brought into Haiti from Colombia and other locations in South America by drug traffickers. After the drugs were unloaded in Haiti, they were then smuggled into Miami, Florida and other locations in the United States by vessels and commercial airlines. PHILIPPE knowingly used his position as a high-ranking Haitian National Police officer to provide protection for these shipments of drugs and drug proceeds into Haiti in exchange for cash payments.

> Specifically, beginning in or around June 1999 and continuing until in or around April 2003, Philippe and others were paid in Haiti from the proceeds of the cocaine sales that occurred in Miami, Florida and elsewhere in the United States. Those bulk-cash proceeds would be smuggled from the United States to Haiti, and PHILIPPE would be paid a portion of the proceeds.

> PHILIPPE and his wife maintained a joint banking account at First Union National Bank

in Miami, Florida. Between June 1999 and December 2002, PHILIPPE knowingly wired over $376,000 in U.S. Dollars derived from the sale of cocaine from Haiti and Ecuador to this First Union National Bank account under the names of other people. PHILIPPE also knowingly arranged for over $70,000 in U.S. Dollars of drug proceeds to be deposited into the account. Each of these cash deposits was made in amounts less than $10,000 to avoid the reporting requirements.

From approximately June 1999 to approximately April 2003, PHILIPPE received more than $1,500,000 and less than $3,500,000 in bribe payments from drug traffickers, knowing that the payments constituted proceeds of cocaine trafficking. PHILIPPE shared the drug proceeds he collected with Haitian National Police officials and other security personnel to ensure their continued support for future drug shipments arriving in to (sic) Haiti; to purchase a residence in Broward County, Florida; and to support himself and his family in the United States.

All in violation of 18 U.S.C. § 1956(h).

(Cr-DE#64:1-2).

## B. **Procedural Background**

### 1. *The Indictment*

Over a decade ago, on November 22, 2005, a federal grand jury indicted Movant with the following offenses: (1) Conspiracy to Import Cocaine into the United States in violation of 21 U.S.C. § 963; (2) Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(h); and, (3) Engaging in Transactions Derived from Unlawful Activity in violation of 18 U.S.C. § 1957. (Cr-DE#3). On January 31, 2006, a sealed notice to place Movant on fugitive status was docketed. (Cr-DE#5). The indictment was unsealed on

January 6, 2017. (Cr-DE#8).

### 2. *The Pre-Trial Motions and the Omnibus Order*

On February 28, 2017, Movant's trial counsel filed a Motion to Dismiss Indictment for Unreasonable and Unnecessary Post Indictment Delay (Cr-DE#36), a Motion to Abate Prosecution Based on Immunity as a Foreign State Official (Cr-DE#37), and a Motion to Dismiss for Lack of Personal Jurisdiction. (Cr-DE#38). The Government's responses to those pre-trial motions were filed on March 10, 2017. (Cr-DE#s 43, 44, 45). Movant's trial counsel filed replies to those Responses. (Cr-DE#s 51, 52, 53). Ultimately, On March 17, 2017, the Court issued an Omnibus Order denying all motions. (Cr-DE#57).

### 3. *The Plea Agreement and Plea Colloquy*

On April 24, 2017, Movant executed a plea agreement. (Cr-DE#63). Therein, Movant agreed to plead guilty to Count 2. (Cr-DE#63:1). In exchange, the Government agreed to seek dismissal of Counts 1 and 3. (Cr-DE#63:1).

The plea agreement contains an appeal waiver. The plea agreement specifically states that Movant "waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed...or to appeal the manner in which the sentence was imposed[.]" (Cr-DE#63:5). It further states that this appeal waiver applies "unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing." (Cr-DE#63:6). The plea agreement does not explicitly state that Movant waives all appeals, including those related to his pre-trial motions, by pleading guilty.

However, it states, in relevant part, that "[t]here are no

other agreements, promises, representations, or understandings."
(Cr-DE#63:7). The district court held the change-of-plea hearing on
April 24, 2017. (Cr-DE#76). At the change-of-plea hearing, the
district court asked Movant about this language:

> THE COURT: Has anyone made to you any promises
> or assurances in exchange for your plea of
> guilty that are not contained in this written
> plea agreement?
>
> THE DEFENDANT: No, Your Honor.

(Cr-DE#76:12). Appearing on behalf of the United States, AUSAs Lynn
Kirkpatrick, Andy Camacho, and Mark Irish were present. On behalf
of Movant, Movant's trial attorneys Zeljka Bozanic and Alan Ross
appeared.

Movant agreed to conduct the plea colloquy in English because
he "speaks and understands English" and "prefers to do the plea in
English." (Cr-DE#76:4). A Creole interpreter was present and on
standby to translate any difficult words. (Cr-DE#76:4).[3]

Before swearing in Movant, the Court explained as follows:

> THE COURT: If at any time you do not
> understand any of my questions, please let me
> know, and I will try to clarify the question
> for you. Also, if at any time you would like
> to speak with your attorneys and consult with
> them off the record, let me know that and we
> will pause to give you an opportunity to do
> so.
>
> And last, please note that you are under

---

[3] Movant clarified at the evidentiary hearing in this proceeding that the
plea colloquy was translated into Creole for him.

> oath. All of your answers to my questions must
> be truthful. If they are not, you may be
> subjecting yourself to charges of perjury. And
> do you understand these instructions?
>
>         THE DEFENDANT: Yes, Your Honor.

(Cr-DE#76:5).

Regarding competency, Movant stated that he: (1) went as far as college with respect to his education; (2) had never been treated for mental illness or for an addition to narcotic drugs; (3) had not taken drugs or alcohol in the last forty-eight hours; and (4) did not believe he suffered from a physical or mental condition preventing him from understanding what was happening in the courtroom. (Cr-DE#76:5-6). Defense counsel stated that they were satisfied with Movant's competence to enter a plea. (Cr-DE#76:6).

With respect to trial counsel's representation, Movant stated that he received a copy of the indictment, discussed the indictment with his attorneys, and discussed the case in general with his attorneys.  (Cr-DE#76:6). Movant also swore that he was fully satisfied with his attorneys, their representation, and the advice received from them. (Cr-DE#76:6).

Regarding the voluntariness of his plea, Movant stated that: (1) he understood the charge for conspiracy to launder monetary instruments; (2) his attorneys went over the indictment, discovery, the evidence, and all possible defenses before pleading guilty; and (3) no one pressured, forced, or coerced him into pleading guilty. (Cr-DE#76:7-8, 12).

After reviewing provisions of his plea agreement, Movant

pleaded guilty. (Cr-DE#76:16). This Court accepted his guilty plea. (Cr-DE#76:16). In doing so, this Court found that Movant: (1) was fully competent and capable of entering an informed plea; (2) was aware of the nature of the charges and the consequences of his plea based upon his conversations with his attorneys and the colloquy; (3) made a knowing and voluntary guilty plea; (4) made a plea that was supported by an independent basis in fact containing each of the essential elements of the offense; (5) entered into the agreement voluntarily and did not endure force, threat, or coercion, and (6) received effective assistance of counsel from competent counsel. (Cr-DE#76:16).

### 4. *Sentencing*

On June 21, 2017, the district court held a sentencing hearing. (Cr-DE#77). The district court observed that the advisory guideline recommended a sentence between 108 and 135 months for the conduct related to count two. (Cr-DE#77:8). The Government and Movant's trial attorneys recommenced a 108-month term of incarceration. The Court sentenced Movant to a term of 108 months of imprisonment with a three-year term of supervisory release to follow. (Cr-DE#77:8).

Movant was advised that he had the right to appeal and that such an appeal should be filed fourteen days after entry of the judgment. (Cr-DE#77:9). The Government then requested a dismissal on Counts 1 and 3. (Cr-DE#77:9). The Court did so. (Cr-DE#77:9). Judgment was entered on June 22, 2017. (Cr-DE#72). A notice of appeal was not filed.

### 5. *Filing of Instant Section 2255 and Briefing*

Movant instituted the instant section 2255 action on February 12, 2018. (DE#1). His pro se amended section 2255 motion to vacate

was docketed on March 12, 2018. (DE#8). Contemporaneous with that amended motion, Movant filed a memorandum in support. (DE#9).

Therein, Movant asserted three ineffective-assistance-of-counsel claims. Claim one contends that his trial counsel was constitutionally ineffective for failing to file a requested appeal on his pre-trial motions. Claim two contends that his trial counsel was constitutionally ineffective in how the motion to dismiss for lack of personal jurisdiction was presented to this Court. Claim three contends that counsel was constitutionally ineffective for failure to investigate or properly present the motion to dismiss for violation of speedy trial rights. And last, underlying all of these claims, Movant contends his guilty plea was not knowingly and voluntarily entered into.

On March 19, 2018, the undersigned issued an order appointing counsel, setting an evidentiary hearing, and setting a briefing schedule as to claim one in Movant's pro se section 2255 motion. (DE#11). The Government's Response was filed on June 8, 2018. (DE#21). Movant's reply, which was filed with the assistance of counsel, was filed on June 25, 2018. (DE#27).

On July 5, 2018, Movant's counsel filed what was titled as "Objections" to the order directing him to file a pre-trial narrative statement. (DE#29). The undersigned construed this as a motion for reconsideration. (DE#30). In that construed motion for reconsideration, Counsel for Movant asserted that an evidentiary hearing was needed on all claims and presented additional argumentation to the merits of Movant's claims. (DE#29). Still construing the filing as a motion for reconsideration, the undersigned permitted supplemental briefing. (DE#30). On July 13, 2018, pursuant to that order, Counsel for Movant opted to file a

12

supplemental brief in support of Movant's section 2255 motion. (DE#31). The Government filed its Response on July 20, 2018. (DE#33).

### 6. *Evidentiary Hearing*

Before the hearing was held, the parties filed their pretrial narrative statements. Movant's general statement of the case asserted that he mistakenly thought his lawyer had filed an appeal on the pre-trial motions when he entered into a plea agreement. (DE#32:1). Movant, according to his account, thought his appeal was pending when he accepted the plea deal and pled guilty. (DE#32:1). The pretrial narrative statement further avers that Movant "became aware" that his appeal was not pending after a fellow inmate informed him he should have "heard something about his appeal." (DE#32:2). After speaking with an attorney and hiring their services, "they discovered" that an appeal was not pending and concluded that the instant section 2255 action was the sole avenue for relief. (DE#32:2).

The Government's pre-hearing narrative statement submitted that an evidentiary hearing will show that Movant's trial attorneys consulted with Movant about the consequences of his plea. To be specific, the Government anticipated showing that Movant understood that, by pleading guilty, it would operate as a resolution of the case entirely after the pre-trial motions were denied. (DE#34:4-5). The Government also asserted that an evidentiary hearing will establish that discussions about filing an appeal on the pre-trial motions occurred when Movant's case was still postured to go to trial. (DE#34:4). Further, the Government asserted that it would show, despite a continued correspondence with trial counsel post-sentencing, Movant never mentioned or inquired about an appeal. (DE#34:5). Trial counsel was also expected to testify that no one on Movant's behalf contacted her either. (DE#34:5).

13

The hearing was held on August 28, 2018. During which, six witnesses testified. AUSAs Lynn Kirkpatrick and Andy Camacho appeared for the Government. Philip Pitzer appeared for Movant. Movant called all six witnesses. The Government called one. Both called trial counsel, Ms. Zeljka Bozanic, for direct examination. The Government presented eight exhibits, which were admitted without objection.

a. Summary of Testimonies

### 1. *Mr. Mark O'Brien*

Mr. Mark O'Brien testified that he had a client who was a cellmate with Movant. Movant, according to Mr. O'Brien's testimony, asked him whether his firm handles appellate issues. Movant also asked whether Mr. O'Brien's law firm could file a notice of appeal and whether an appeal had been filed in his case, according to Mr. O'Brien's testimony. Mr. O'Brien explained that he referred the matter to Ms. Rachel Reese, another attorney in his law firm.

During cross-examination, Mr. O'Brien stated that his exchange with Movant occurred in August of 2017. Mr. O'Brien, while on the stand, conceded to having no knowledge of the discussions that Movant had with his attorneys, no knowledge of what happened in Movant's case, and no involvement in the postconviction assessment of whether a notice of appeal had been filed in Movant's case. In essence, Mr. O'Brien testified that he merely consulted with Movant and then referred him to another attorney in his office.

### 2. *Ms. Rachel Reese*

Ms. Rachel Reese testified that she was referred to Movant's case by her law partner. Ms. Reese first spoke with Movant by phone in September of 2017. On the stand, she explained that she told

Movant that a notice of appeal had not been filed in his case during that September 2017 conversation. According to her testimony, Ms. Reese construed Movant's reaction to this news as "concerned." Ms. Reese also testified that she prepared a section 2255 motion on Movant's behalf and was shocked to discover that Movant filed his own pro se version.

Ms. Reese, during cross-examination, stated that her knowledge of Movant's case was based upon Movant's account and certain documents that had been sent to her from Movant's wife. She also conceded to never speaking with either of Movant's trial attorneys.

### 3. *Mr. Junior Maxi*

Mr. Junior Maxi testified that he is familiar with Movant on account of them "growing up together" in Haiti. Upon Movant being arrested, Mr. Maxi explained that he contacted Movant's wife. Mr. Maxi also testified that he kept track of Movant's case throughout the proceedings. According to Mr. Maxi's testimony, during a June 6, 2017 conversation, he spoke with Movant's trial counsel, Ms. Zeljka Bozanic, about filing an appeal.  Of particular note, in order for Mr. Maxi to use the word "appeal" during this testimony, the undersigned had to supply him with that word.

In response to being asked the content of his discussions with trial counsel, Mr. Maxi responded that he discussed payment for trial counsel's legal services. Mr. Maxi also explained that he told trial counsel not to forget the appeal. According to Mr. Maxi's sworn account, trial counsel responded by telling Mr. Maxi that she was no longer Movant's attorney because the case was over.

Mr. Maxi stated that this discussion with trial counsel occurred after Movant changed his plea and was sentenced. Mr. Maxi

also testified that trial counsel was "going to do the appeal event like (sic) when the case is over."

During cross-examination, Mr. Maxi testified that he had no conversations with trial counsel prior to June 6, 2017. Mr. Maxi also conceded that he was not present in any meetings between Movant and trial counsel.

While under cross-examination, Mr. Maxi stated that he spoke with Movant about an appeal before the sentence. Mr. Maxi also testified that the appeal was supposed to be filed before the sentence. When the Government asked how Mr. Maxi knew it was supposed to be filed before the sentence, Mr. Maxi explained "[b]ecasue he tells me."

Mr. Maxi was then asked whether he had any understanding of what issues needed to be appealed. Mr. Maxi replied that Movant was "going to appeal the case because he is going to plead not guilty."

Towards the end of cross-examination, the Government clarified the record by having Mr. Maxi admit that he spoke with trial counsel on June 6, 2017 and on June 8, 2017. On the stand, Mr. Maxi admitted that the first time he spoke with Movant about his appeals was after Mr. Maxi spoke with trial counsel. In attempting to solidify this point, the Government inquired about the first time Mr. Maxi spoke with Movant about Movant's appellate issue.  Mr. Maxi testified that it was "after the sentence." In response to being asked whether he recalled the sentencing date, Mr. Maxi admitted that he did not.

### 4. *Mrs. Natalie Philippe*

Mrs. Natalie Philippe is Movant's wife. She lives in Milwaukee, Wisconsin and has been married to Movant for over twenty-one years. Based upon a referral, she contacted Movant's trial counsel, Ms. Zeljka Bozanic, to appear with him. Mrs. Philippe testified that she spoke with trial counsel about fees and what could happen, including the potential filing of pretrial motions. A verbal fee agreement was created for a flat rate of $50,000, according to Mrs. Philippe's testimony. Mrs. Philippe also explained that Movant's second trial attorney, Mr. Alan Ross, was unofficially part of the litigation team during the drafting of the pretrial motions.

Mrs. Philippe testified that she relayed messages to both of Movant's trial attorneys of Movant's desire to appeal "right after [they] found out" the pretrial motions were denied. The attorneys responded that they would speak with Movant about how to proceed with the appeals, according to Mrs. Philippe's testimony.

Still under direct examination, Mrs. Philippe testified that she spoke with Movant's attorneys about the negotiated plea agreement. She did not recall whether either attorney explained that accepting the plea deal would terminate Movant's opportunity to appeal. According to Mrs. Philippe, Movant appeared "angry" upon discovering that an appeal had not been filed. She averred on the stand that Movant appeared "devastated" about being misinformed. Mrs. Philippe does not know whether anyone contacted Movant's trial attorneys upon discovering that an appeal was not pending. When asked why Movant did not contact his attorneys upon discovering that an appeal was not pending, Mrs. Philippe testified to Movant's character trait of being "finished" with persons that do not do their job.

Under cross-examination, the Government drew out testimony in order to raise questions about Mrs. Philippe's motives to testify in Movant's favor in this proceeding. In particular, the Government drew out testimony about Mrs. Philippe's marriage to Movant and the courtship that preceded their marriage. Mrs. Philippe also testified that the first conversation about Movant's appeal initiated after the pretrial motions were denied. Mrs. Philippe testified that she was personally present during a conversation between Movant and Ms. Bozanic in January of 2017. She admitted to never being present during any conversations between Movant and Movant's other trial attorney, Mr. Alan Ross. In addition, Mrs. Philippe explained that she relayed messages to Movant's trial attorneys every time Movant contacted her. Mrs. Philippe could not recall the last time she communicated with trial counsel.

Still under cross-examination, Mrs. Philippe estimated that Movant discovered that an appeal was not filed "after the plea." On re-direct, Mrs. Philippe testified that she never discussed the terms of the plea agreement with her husband. Presumably attempting to clarify the time line of Mrs. Philippe's testimony, Movant's counsel inquired whether Mrs. Philippe recalled that Movant's trial attorneys were involved during the sentencing phase. Under oath, she recalled this fact and explained that, from her perspective, the events were "all jumbled together."

### 5. *Mr. Guy Philippe - Movant*

Movant testified that he was born in Haiti and was educated. With respect to his education, Movant explained that he studied chemistry at the University of Mexico for some time and left that university to pursue his studies at a military academy in Ecuador. During his time at the military academy in Ecuador, Movant studied law. Movant also spent considerable time testifying to matters

18

surrounding his reputation as a political figure in Haiti.

Movant testified that his trial counsel, Ms. Bozanic, was present at court appearances with him since the initial appearance. Movant explained that the two of them discussed the legality and constitutionality of his being brought to this country. From Movant's perspective, the criminal proceeding was politically motivated.

Under direct examination, Movant also explained his understanding of the pretrial motions that were filed in his case. Movant acknowledged that this Court denied his pretrial motions. He testified to his understanding that he had approximately fourteen days to appeal the order denying those pretrial motions.

While still under direct examination, Movant was asked whether he mentioned an appeal after the pretrial motions were denied. He testified that "each time" that he spoke to his attorneys he discussed the appeal of his pretrial motions. Movant also averred that he relayed messages through his brother and wife that the appeal must be timely filed. According to Movant's testimony, his attorneys always told him not to worry about the filing of an appeal. Movant testified that he accepted his plea agreement while under the belief that his appeal on the pretrial motions was still pending.

Under oath, Movant stated that his attorneys reviewed the plea agreement with him. When asked whether he was informed that he would be waiving his right to appeal his pretrial motions, Movant avers that his attorneys never discussed the pretrial motions. Movant recalled that the language in the plea agreement contained a waiver of his right to appeal. However, with respect to whether

any language in the plea agreement indicated to him that he was waiving his right to appeal the pretrial motions, Movant did not directly answer the question. Instead, he testified that his trial counsel told him that the appellate waiver only related to sentencing issues. In the beginning of July of 2017, according to his testimony, Movant first learned that an appeal on his pretrial motions was not filed. According to Movant, upon having Ms. Reese confirm that no appeal had been pursued by his trial attorneys, he concluded that his attorneys were "working for both sides." Based on that belief, Movant decided to use a different attorney.

Under cross-examination, Movant explained that he was unable to access court records from the jail. Movant also testified that he did not rely upon the accounts of his wife or Mr. Maxi, as they did not have an understanding of how the law operates. Movant swore that he saw the indictment against him, but did not understand how much time he was facing for the individual charges.

While still under cross-examination, Movant stated that he understood all that was told to him at his change-of-plea hearing. Upon being asked whether Movant recalled being asked that his plea agreement waived his right to appeal, Movant did not answer the question. Instead, he testified that his trial counsel told him that he was waiving sentencing issues by pleading guilty and averred to his belief that the pretrial motions had already been filed. The Government again asked Movant if he recalled what the Court said to him about his appellate waiver. Again, Movant did not answer the question and deferred to the alleged advice given to him by his trial attorneys.

The Government continued with this line of questioning by addressing whether Movant recalled other provisions in the plea

agreement that were communicated to him at the change-of-plea
hearing. Movant's responses did not answer whether he recalled
those provisions. Movant deferred back to his understanding that
the appeal of his pretrial motions had already been filed.
Thereupon, the Government inquired whether Movant articulated his
belief to the Court. Movant testified that he was not advised that
he needed to do so. According to Movant, he did not ask for
clarification on the appellate issue because his level of English
comprehension comported with what he was being told. The Government
asked whether a translator was translating English into Creole.
Movant conceded this as true. However, according to Movant, the
translator kept using the word "sentence," implying that the word
"appeal" was never used during the translation.

     Movant testified that it had been more than a year since he
spoke to his trial counsel directly. All other communication, from
what Movant recalled on the stand, was most likely conducted
through a third party after the sentencing proceeding.

### 6. *Ms. Zeljka Bozanic - Trial Counsel*

     Ms. Bozanic testified that she entered into a verbal agreement
to represent Movant. Movant and his family never signed a written
agreement that had been drafted. The terms were $60,000 if the case
did not go to trial. If the case went to trial, trial counsel would
charge $100,000. Ms. Bozanic testified that Movant's wife paid a
down payment of $5,000. Mr. Maxi, sent her $3,500. Beyond that, she
was not paid the difference of the sum agreed upon.

     Ms. Bozanic testified that they had considered filing an
interlocutory appeal after the pre-trial motions were denied. She
explained, under oath, that the strategy was to proceed with trial
at that juncture. Both of Movant's trial attorneys, according to

Ms. Bozanic, decided that any appeal would be filed after trial to avoid delaying Movant's trial date.

Upon reviewing discovery provided by the Government, additional hurdles faced Movant, according to Ms. Bozanic. She explained that the discovery materials made it difficult to refute one count because bank records from many years ago were no longer obtainable. Further, according to Ms. Bozanic's testimony, there were also matters that Movant did not want surfacing at trial.

Once the negotiated plea deal was reached, Ms. Bozanic recalled her and her co-counsel going over the terms of the plea agreement. She had no recollection of Movant having any questions. Movant's trial attorneys, as Ms. Bozanic testified, went paragraph by paragraph through the plea deal with Movant. Ms. Bozanic also did not recall whether Movant had any questions during the colloquy. She deferred to the hearing's transcript. Ms. Bozanic testified that she continued a correspondence with Movant even after sentencing.

According to her testimony, Ms. Bozanic stated that Movant was involved in the decision to plead guilty. Ms. Bozanic stated that she never discussed the appeal of the pre-trial motions after the change-of-plea hearing. In her testimony, Ms. Bozanic expressed that Movant knew there was nothing pending after the change-of-plea hearing and that Movant was informed his plea ended the criminal proceeding in its entirety. Upon being asked whether Movant inquired about an appeal after the change-of-plea hearing, Ms. Bozanic testified that Movant did not. She added that "we went over the appellate waiver" to explain that he would be giving up his right to appeal the motions in exchange for the plea deal. In addition, after being asked whether Movant inquired about an appeal

after the sentencing proceeding, Ms. Bozanic testified that Movant did not do so.

Ms. Bozanic further testified that she received multiple e-mails and other written forms of communication from Movant. None mentioned his appeal on the pre-trial motions. Similarly, Ms. Bozanic testified that she received communications from Movant's family members; However, none mentioned the filing of an appeal. With respect to Movant's wife, Ms. Bozanic only recalled an e-mail about Movant's conditions of confinement. Specific to Mr. Maxi, Ms. Bozanic testified that she never talked about Movant's case with Mr. Maxi, as she viewed Mr. Maxi's English-proficiency to be limited.

The Government also introduced a letter sent by Movant to Ms. Bozanic, admitted as Exhibit 8. The letter, dated January 2, 2018, was read into evidence by Ms. Bozanic and reads as follows:

> Hi Zeljka,
>
> How are you? I hope you had wonderful holidays. I'm okay trying to survive. Thanks for the documents. I'd like you to send the bank statements and "checks" if it [is] possible. I really need them. I also need a copy of the medal [sic] (secretary of defense)[.]
>
> Thanks & Happy new year[,]
>
> Guy Philippe

The Government asked Ms. Bozanic whether this letter mentioned an appeal. Ms. Bozanic replied, "no."

23

**b. Credibility Assessment**

1. *Movant's Credibility*

Overall, Movant's account is not credible. Movant testified that he pled guilty while under the assumption that he would not be waiving an appeal of his pre-trial motions. In support, as he testified, Movant avers that he believed the appeal on his pre-trial motions were pending as an interlocutory appeal. To his credit, the plea agreement and the plea colloquy does not explicitly reflect that he would be waiving an appeal on his pre-trial motions. Additionally, his wife and trial counsel agree that an appeal was discussed immediately after the pre-trial motions were denied. However, this alone is not enough to render Movant credible on the material issues in this proceeding.

Movant's testimony exhibited a deliberate effort to dodge the truth. Movant's responses were evasive about the most basic of questions that relate to the underlying issue in this proceeding. For instance, Movant never directly answered the Government's question whether he recalled the appellate waiver. Instead, he directed this Court's attention to his allegation that his trial counsel did not tell him of the appellate waiver as to the pre-trial motions. From the undersigned's observations and the content of his responses, Movant's evasive demeanor indicates his testimony lacks some credibility.

At the evidentiary hearing, Movant conceded that he never alerted his trial attorney about her alleged failure to file an appeal. According to Movant, he decided against reaching out to his trial attorneys because he decided they were working for "both sides." Movant, according to his testimony, confirmed his suspicions that his trial attorneys had not filed an appeal in July of 2017. Of particular interest, the letter Movant sent to his

trial attorney, dated January 2, 2018, makes no mention of an appeal nor reflects the attitude of a disgruntled client merely seeking requested document. As Movant's amiable letter was sent months after he allegedly confirmed that his trial attorneys were working for "both sides," Movant's purported excuse for not contacting his trial attorney lacks credibility.

There are also several inconsistencies between what was stated at the change-of-plea hearing and Movant's insistence that he silently believed his appeal was pending. Movant is an astute, political figure in Haiti. He is a Haitian senator and studied law. These are facts Movant drew out at the evidentiary hearing. At the change-of-plea hearing, the following exchange transpired:

> THE COURT: Do you understand by pleading guilty, you give up all of these rights we associate with trial as well as with appeal?

> [MOVANT]: Yes, Your Honor.

(Cr-DE#76:14). Given Movant's educational and professional background, it is highly unlikely that the broad appellate waiver expressed to Movant at the change-of-plea hearing would not alert him that an appeal might not be pending or might not follow.

Conveniently, Movant testified that he was unaware that he should alert the Court of any such questions. Again, Movant's educational and professional background renders it implausible that he would not ask a question related to an appeal of the pre-trial motions if he had one or if he wanted to pursue one. More importantly, Movant's assertion that he was unaware that he could alert the Court of any questions lacks credibility in light of the Court's instruction to him. During that hearing, the Court instructed as follows:

> If at any time you do not understand any of my
> questions, please let me know, and I will try
> to clarify the question for you. Also, if at
> any time you would like to speak with your
> attorneys and consult with them off the
> record, let me know that and we will pause to
> give you an opportunity to do so.

(Cr-DE#76:5). As such, Movant's assertion that he did not know to
alert the Court or his attorneys of this question is spurious.

Somewhat cunningly, at the evidentiary hearing, Movant
testified that he could not ask for clarification on the appellate
issue during the proceeding because his level of English was
limited. In this proceeding, Movant testified at the evidentiary
hearing with the assistance of a Creole interpreter. Movant's
assertion that he did not understand English is a smokescreen for
the truth. As shown by the record, Movant—through his attorney—
selected to conduct the change-of-plea proceeding in English
because he "speaks and understands English" and because he
"prefer[red] to do the plea in English." (Cr-DE#76:4). Further, a
Creole interpreter was present and ready to translate if ever a
difficult word appeared during the change-of-plea hearing. (Cr-
DE#76:4). Moreover, at the evidentiary hearing, Movant admitted
that there was someone translating in Creole at the change-of-plea
proceeding. Because Movant had a Creole interpreter and selected to
make his own statements in English, it is unlikely that he felt
unaware of his ability to have questions answered or clarified.

Further, while all litigants necessarily harbor a motive to
construct a favorable narrative for themselves, only some act upon
that motive by way of lying. Here, Movant previously selected to
conduct the colloquy in English due to his purported preference to
do so. In this proceeding, he now swears that his English
comprehension was so poor he could not understand that proceeding

even though a translator was present. Viewed together, Movant exhibited that he is willing to lie or make material omissions under oath in order to construct his favorable narrative.[4]

In addition, one could draw a reasonable inference that Movant purposefully chose to conduct his change-of-plea proceeding in English so that he could later feign ignorance. This is not to say that every section 2255 litigant asserting they did not understand English at the colloquy would warrant the drawing of such an inference. Rather, such an inference is appropriate in this particular case because of Movant's educational and professional background, his evasive responses to simple questions, and his demonstrated willingness to lie or make material omissions under oath.

Another inference can be drawn with respect to Movant's purported reason for not alerting his trial attorney after purportedly discovering an appeal had not been filed.[5] The inference is that Movant understood his trial counsel would have mailed a written response memorializing that he was explicitly told that no such appeal would follow. Of course, such a response would have been sent to Movant before the filing of a section 2255 motion, which arguably would have weakened Movant's credibility. Given Movant's educational and professional background, and his demonstrated pattern of stretching the truth, the undersigned finds such an inference more reasonable than the peculiar excuse supplied

---

[4] At the evidentiary hearing, Movant stated that the translators were merely translating the words "sentence, sentence," implying that the translators did so when they should have translated the Creole word for "appeal." It is highly improbable that Court translators would err in their translation of a word that surfaces in this Court on a daily basis.

[5] In support of reaching this inference regarding Movant's excuse, it is important to note that Movant's speculation that trial counsel was working for "both sides" was not a reasonable conclusion.

by Movant (i.e. counsel working for "both sides").

Finally, Movant's assertions as to what counsel advised him about his guilty plea reveal his testimony contains a certain lack of reliability. At the hearing, Movant insisted that his trial attorney told him that the plea of guilty only applied to sentencing issues. It is practically hornbook law that the entry of a guilty plea waives all non-jurisdictional errors, meaning guilt phase issues are waived as well. See, e.g., United States v. Patti, 337 F. 3d 1317, 1320 (11th Cir. 2003). Given that Ms. Bozanic is an experienced criminal defense attorney, it is highly unlikely that Ms. Bozanic would have misstated such an axiomatic legal principle. Rather, it is more reasonable to draw an inference that Movant makes this assertion to inflate his purported mistaken belief of an already-filed appeal. Movant's lack of credibility in other areas further justifies drawing this inference.

## 2. *Mark O'Brien's Credibility*

Mr. O'Brien's testimony simply related to Movant's questions about his appeal. Responsibly, Mr. O'Brien told Movant that he had no knowledge of his case, so he could not answer whether an appeal was pending. Because Mr. O'Brien and his firm had no involvement with Movant until on or about August 6, 2017, the firm had no knowledge of the discussions between trial counsel and Movant. Nor would it have any knowledge of the discussions with the Government. Thus, while the Court respects Mr. O'Brien's willingness to appear and testify, it cannot be said that Mr. O'Brien's knowledge of this case is relevant to the issues in this case.[6]

---

[6] To the extent Movant relies upon him asking Mr. O'Brien to look into his appeal as evidence that he believed an appeal was pending, an equally reasonable inference is that Movant purposefully spoke with an attorney in order to later construct a favorable narrative. Movant's lack of credibility would justify the reasonableness of such an inference over the inference Movant appears to invite this Court to draw.

### 3. *Ms. Reese's Credibility*

Ms. Reese's contribution was informing Movant that an appeal had not been filed in his case. She testified that she construed Movant's response to being informed that an appeal had not been filed as "concerned." This occurred in September of 2017.

Although Ms. Reese may have had a good faith belief that Movant appeared "concerned," Ms. Reese's testimony is not credible for the purposes of supporting an inference that Movant was surprised, upset, or concerned by the fact his appeal was not pending. Indeed, Ms. Reese acknowledged that her understanding of this case is limited to what the filings in the docket show, some undisclosed documents received from Movant's wife, and Movant himself. None of those sources could generate personal knowledge of the oral communications between Movant and trial counsel.[7]

### 4. *Mr. Maxi's Credibility*

Mr. Maxi stated that Movant wanted to appeal so that Movant could plead not guilty, which directly conflicts with Movant's guilty plea. In addition, Mr. Maxi testified that the first time he spoke with Movant about the appellate issue was "after the sentence." Curiously, Mr. Maxi also testified that the first time he spoke with Movant about an appeal was "before the sentence." Mr. Maxi also testified that he did not recall the date of sentencing. He also did not volunteer an approximate date of sentencing. Because Mr. Maxi does not appear to have a sufficient understanding of procedural events in the underlying criminal case, his testimony as to the time line of events is not credible.

---

[7] To the extent Movant would rely upon the fact that he hired Ms. Reese to look into whether an appeal was pending as evidence that he did not know an appeal was pending, an equally reasonable inference is that Movant paid for legal services in order to later construct a favorable narrative. Movant's lack of credibility would justify the reasonableness of such an inference over the inference Movant appears to invite this Court to draw.

Another issue, because Mr. Maxi testified that Movant was going to appeal so that he could later plead not guilty, it does not seem that Mr. Maxi sufficiently understood the legal issues in the criminal case. Consequently, it cannot be said that Mr. Maxi is a credible witness as to any issue surrounding Movant's understanding of the plea agreement.

To the extent Mr. Maxi's testimony is capable of justifying an inference that Movant thought his appeals were pending when he pled guilty or would be filed after pleading guilty, the inference is not warranted. Mr. Maxi was not present in discussions with trial counsel and Movant. Mr. Maxi also shares close ties with Movant, revealing some motive to testify favorably. Further bolstering this point, as trial counsel testified, she would not have discussed legal issues with Mr. Maxi based on her perception of Mr. Maxi's English-proficiency.[8] Accordingly, Mr. Maxi's testimony is entirely incredible.

### 5. *Mrs. Philippe's Credibility*

Mrs. Philippe's testimony was clear.  She is credible to the extent that she forwarded an email about appealing the denial of the pretrial motions when those motions were denied. However, Mrs. Philippe is not credible on other issues.

She testified that her husband stopped all communication with trial counsel after the plea of guilty. As she put it, Movant was "finished" with trial counsel. On redirect, Counsel for Movant then tried to have Mrs. Philippe testify that Movant cut ties with trial

---

[8] During the hearing, the Government stopped Mr. Maxi's testimony to suggest a Creole interpreter on the basis that it had some difficulty "understanding some of the words" used by Mr. Maxi. This arguably comports with trial counsel's decision to not discuss legal matters with Mr. Maxi despite his close ties to Movant.

counsel after sentencing, not after the guilty plea. She testified as much. Thereupon, Mrs. Philippe also added that the guilt phase and sentencing phase were "all jumbled together" to her. Consequently, her ability to delineate critical procedural junctures is not reliable. This is a small inconsistency affecting her credibility.

However, this small inconsistency in her understanding of the procedural events demonstrates a larger inconsistency overall. To be exact, Mrs. Philippe's testimony that Movant cut ties with trial counsel upon discovering an appeal was never filed does not comport with the fact that Movant continued a written correspondence with trial counsel as late as January 2, 2018—an undisputed fact.

More importantly, although Mrs. Philippe testified that Movant was "angry" upon discovering his appeal was not pending, her testimony does not mention any action she took upon discovering this perceived error. Surely, if she or her husband were caught off guard by trial counsel not filing an appeal, interlocutory or otherwise, Mrs. Philippe would have contacted trial counsel to complain. In fact, during her testimony, Mrs. Philippe suggested that she had contacted Movant's trial attorneys throughout the proceedings. Her demonstrated rapport with Movant's trial attorneys indicates that, if she or her husband were caught off guard by the failure to file an appeal, she likely would have alerted them of any perceived error. As her testimony does not indicate any such action occurred on her part, her lack of action weakens her credibility as a witness on critical issues. Finally, because Mrs. Philippe shares close ties with Movant as his wife, it also indicates a motive to testify favorably for him.

As a result, Mrs. Philippe is credible to the extent that she

forwarded an email when the pre-trial motions were denied. But she
is not credible as to any inference that can be drawn regarding her
husband's alleged understanding that an interlocutory appeal was
pending when he pled guilty. Nor is Mrs. Philippe credible as to
any inference that can be drawn with respect to whether Movant
understood an appeal would follow after pleading guilty.

### 6. *Ms. Bozanic's Credibility*

At the hearing, Ms. Bozanic's testimony provided a linear,
consistent account as to the relevant events. This renders Ms.
Bozanic a substantially credible witness in this proceeding.

Ms. Bozanic testified that she and Movant's other trial
attorney, Mr. Alan Ross, initially considered filing an
interlocutory appeal on the denial of Movant's pre-trial motions.
Both trial attorneys decided on not filing an appeal because of a
strategy to proceed to trial and file an appeal afterwards in the
event of an unfavorable outcome. Th main concern with filing an
interlocutory appeal, as Ms. Bozanic testified, was waiving a
speedy trial claim and the cost of hiring an additional attorney.
Ms. Bozanic stated that Movant was part of those discussions in
forming this strategic decision. If true, it undermines Movant's
claim that he did not know an interlocutory appeal had not been
filed. Based on her testimony that Movant's family never fully paid
her fee retainer and Movant's lack of credibility overall, Ms.
Bozanic's testimony is credible. Specifically, her testimony is
credible for the purposes of showing that Movant knew an
interlocutory appeal would not be filed.

Ms. Bozanic also testified that Movant was told there was
"nothing pending" in his case when he pled guilty. Movant's trial
attorneys, according to Ms. Bozanic's sworn account, further

advised Movant that upon pleading guilty "that was it." Movant, as Ms. Bozanic testified, knew he was "giving up his right to appeal the motions and anything in exchange for the plea that he was getting." Ms. Bozanic's testimony is credible to this point as well. Consequently, Movant knew that no appeals were pending when he accepted his plea deal and that there was no plan to file an appeal after pleading guilty.

In addition, Ms. Bozanic testified that Movant never made a comment regarding an appeal after he accepted the plea agreement. Ms. Bozanic explained that she met with Movant before the sentence was imposed. She also described a continued correspondence with Movant after the judgment was entered. Bolstering Ms. Bozanic's testimony, the written letter, dated January 2, 2018, shows the existence of a written correspondence and Movant still never mentioning a perceived error with respect to the filing of an appeal. As such, the undersigned finds Ms. Bozanic credible on this point. Thus, Ms. Bozanic never discussed the prospect of filing an appeal after the change-of-plea hearing and after the sentencing date because Movant never discussed an appeal.

Ms. Bozanic testified to the reasons driving the change in strategy from proceeding to trial to a plea of guilty. She explained that they would be unable to defend against the charges related to money laundering because bank records could not be obtained. She also testified that there were matters that Movant did not want surfacing at trial. During her testimony, Ms. Bozanic also explained that the plea agreement was "a very good deal [for Movant] considering that he avoided life [imprisonment]." The underlying criminal record supports that Movant could have been sentenced to life imprisonment. Thus, Ms. Bozanic is credible on this point as well.

### 7. *Summary of All Credibility Determinations*

In sum, the undersigned finds the following testimony incredible:

- Movant's testimony that he believed an interlocutory appeal would be filed and was unaware his attorneys decided not to do so.

- Movant's testimony that his trial attorneys never told him about his plea being conditioned upon him not filing any appeals.

- Movant's testimony that his trial attorney told him his plea agreement and guilty plea only waived sentencing issues.

- Movant's testimony that he never alerted his trial attorneys about the perceived error (i.e. not filing an appeal) because Movant earnestly believed they were working for "both sides."

- Movant's testimony that he had no indication that an appeal was not pending or might not follow while at the change-of-plea hearing.

- Movant's testimony that he did not know he could ask the Court questions at the change-of-plea hearing.

- Movant's testimony that he did not understand the colloquy at the change-of-plea hearing.

- Movant's testimony that he had no indication that an appeal was not pending or might not follow after the change-of-plea hearing, after sentencing, or after judgment was entered.

- Mr. O'Brien's testimony as to any material issue in this

proceeding, including but not limited to any inference that could be drawn about Movant's credibility as to his belief an appeal was pending after judgment was entered.

- Ms. Reese's testimony as to any material issue in this proceeding, including but not limited to any inference that could be drawn about Movant's credibility as to his belief an appeal was pending  after judgment was entered.

- Mr. Maxi's testimony as to any material issue in this proceeding, including but not limited to any inference that could be drawn about Movant's credibility as to his belief an appeal was pending at any point before or after judgment was entered.

- Mrs. Philippe's testimony as to almost all material issues in this proceeding, including but not limited to any inference that could be drawn about Movant's credibility as to his belief an appeal was pending at any point before or after judgment was entered.

In addition to those determinations, the undersigned finds the following testimony credible:

- Mrs. Philippe's testimony that she forwarded an email about the appeal when the pre-trial motions were denied.

- Ms. Bozanic's testimony that Movant was part of the discussions in deciding not to file an interlocutory appeal.

- Ms. Bozanic's testimony that Movant was told acceptance of the plea agreement and entering his guilty plea meant waiving all future appeals, including those related to his pre-trial motions.

35

- Ms. Bozanic's testimony that Movant never mentioned the filing of an appeal at any point after the change-of-plea hearing.

- Ms. Bozanic's testimony that all correspondence she received from Movant or his family after the change-of-plea hearing did not relate to the filing of an appeal on the pre-trial motions.

- Ms. Bozanic's testimony that she thought the plea agreement was quite favorable in light of the more onerous sentence that could have been imposed.

## VI. DISCUSSION

### A. Ineffective Assistance for Failure to File an Appeal and the Validity of Movant's Guilty Plea

Movant contends his trial counsel failed to file a requested appeal or otherwise failed to consult with him. (DE#8:4). In a supplemental brief, Counsel for Movant argued that the plea of guilty was not voluntarily entered into as a result of Movant's mistaken belief that an appeal was pending. (DE#31:2).

### 1. *Guilty Plea was Knowingly and Voluntarily Entered Into*

To conform with due process principles, a guilty plea must be knowingly and voluntarily made. United States v. Moriarty, 429 F. 3d 1012, 1019 (11th Cir. 2005). Under Fed. R. Crim. Proc. 11, district courts must verify whether the plea is free from coercion, the defendant understands the nature of the charges, and the defendant understands the consequences of their plea. Id. There is a presumption that sworn statements made during a plea colloquy are true. United States. v. Medlock, 12 F. 3d 185, 187 (11th Cir. 1994).

After reviewing the transcript of the change-of-plea hearing and Movant's sworn responses, Movant has not carried his burden in

36

showing that his guilty plea was not voluntarily entered into. With respect to whether coercion existed, Movant swore that he was not facing pressure or coercion to plead guilty. (Cr-DE#76:12).

With respect to understanding the nature of the charges against him, the plea agreement shows that Movant acknowledged that the Court could have imposed a sentence of twenty years of incarceration followed by three years of supervisory release, as opposed to the 108-month sentence of incarceration he received. (Cr-DE#63). At the change-of-plea hearing, Movant also acknowledged that he reviewed the indictment and discussed possible defenses with his trial attorney, and reviewed the evidence against him. (Cr-DE#76:8). Movant swore that he was pleading guilty because he was in fact guilty and that the Government would be able to establish the elements of the crime. (Cr-DE#76:12-14). The pertinent facts were then read aloud as articulated in the Factual Proffer. (Cr-DE#76:14-15). Finally, the penalty sheet attached to the indictment shows that Movant could have been alerted that he was facing life imprisonment. (Cr-DE#3:7).

As to whether he understood the consequences of his plea, Movant agreed that he would be giving up all rights associated with trial as well as with appeal. (Cr-DE#76:14). In sum, consistent with the Court's finding, Movant's plea of guilty was knowing and voluntary. (Cr-DE#76:16).

An additional matter must be addressed, however. Counsel for Movant heavily relies upon United States v. Copeland, 381 F. 3d 1101, 1105 (11th Cir. 2004) to suggest that Movant's plea was not knowingly and voluntarily entered into. In essence, Counsel for Movant submits that Copeland authorizes defendants to raise an appeal not explicitly prohibited in a plea agreement. That is an

37

inaccurate articulation of <u>Copeland</u>, however.

In <u>Copeland</u>, the Eleventh Circuit concluded that a plea agreement suffered from ambiguity caused by omission of a term, which both parties conceded rendered the term ambiguous. The Eleventh Circuit decision in <u>Copeland</u> articulates a standard of review when such ambiguity is alleged. "In determining the meaning of any disputed terms in an agreement, courts must apply an objective standard and 'must decide whether the government's actions are inconsistent with what the defendant reasonably understood when he entered his guilty plea.'" <u>United States v. Copeland</u>, 381 F.3d 1101, 1105 (11th Cir. 2004) (quoting <u>In re Arnett</u>, 804 F. 2d 1200, 1202-03 (11th Cir. 1986)). When interpreting plea agreements, courts "do not accept a 'hyper-technical reading of the written agreement' or 'a rigidly literal approach in the construction of the language.'" <u>Copeland</u>, 381 F. 3d at 1105 (quoting <u>United States v. Jefferies</u>, 908 F. 2d 1520, 1523 (11th Cir. 1990)). Rather, "[t]he written agreement should be viewed against the background of the negotiations and **should not be interpreted to directly contradict an oral understanding**." <u>Copeland</u>, 381 F. 3d at 1105 (alternations in original and internal quotations omitted) (emphasis added). Therefore, if and only if the term is ambiguous, courts consider parol evidence to interpret that ambiguous term. <u>Copeland</u>, 381 F. 3d at 1105-06.

Put contextually, this is a two-step inquiry. <u>Copeland</u>, 381 F. 3d at 1106. The first step examines whether or not the disputed term is ambiguous. <u>Id.</u> If so, federal courts "consider extrinsic evidence of the parties' intent in arriving at an interpretation of the agreement's language and will rely on the above-mentioned standards of interpretation." <u>Id.</u> If not, "the unambiguous meaning"

controls. Id. The second step assesses "whether to enforce the agreement, keeping in mind that the validity of a bargained guilty plea depends finally on the voluntariness and intelligence with which the defendant-and not his counsel-enters the bargained plea." Id. (internal quotation marks omitted).

The undersigned concludes that the written agreement is, in fact, ambiguous in the same manner that the plea agreement in Copeland was ambiguous. Both contain an omission as to the underlying dispute. Here, although the Government contends that Movant's plea offer was extended as a global resolution of this case (DE#33:6), the plea agreement does not explicitly reflect that intent. In addition, the plea colloquy arguably suggests, but does not explicitly reflect, that Movant's plea deal was conditioned upon him surrendering all appellate challenges—both jurisdictional and non-jurisdictional. Although the plea agreement states that "[t]here are no other agreements, promises, representations, or understandings" (Cr-DE#63:7), it is unclear whether that language sufficiently conveys a waiver of the pre-trial motions. Because the undersigned finds that the term is ambiguous, the undersigned now turns to parol evidence to consider Movant's intent in entering the plea deal based on oral communications made to him. See Copeland, 381 F. 3d at 1106.

As stated earlier, the undersigned found Movant's account not credible. In particular, Movant's account that he was never told that the plea deal was conditioned upon his acceptance of a global resolution of this case was deemed incredible. After all, he demonstrated that he is willing to make material omissions in order to achieve a favorable narrative. Movant's trial counsel, Ms. Bozanic, was very credible with respect to her testimony. According to her testimony, she told Movant that his plea deal was

conditioned upon him dropping all appeals, including those related to his pre-trial motions. During Ms. Bozanic's testimony, Ms. Bozanic recalled telling Mr. Ross that they would have lacked the leverage to attain such a favorable plea deal had they pursued an interlocutory appeal. As such, her testimony establishes that the plea deal existed only because they were able to sacrifice any appeals on the pre-trial motions.

Approaching the second step, this Court must consider whether Movant reasonably understood that he was ending all litigation by signing the plea agreement and pleading guilty. Movant insisted that he was never informed that he would be ending all appeals. But Movant's lack of credibility and the context supplied by his trial counsel at the evidentiary hearing shows otherwise. This Court should decline to construe the plea agreement rigidly.

Therefore, because any imprecision as to the Government's drafting of the plea agreement can be resolved by looking at the oral communications and backdrop of the negotiations, the plea agreement is construed in the Government's favor. This is because Movant reasonably understood that his plea operated as a global resolution of this case based on those oral communications. Stated succinctly, and as a result, Movant's guilty plea was knowingly and voluntarily entered into.

### 2. *Failure to File an Appeal*

"[A]n attorney who fails to file an appeal on behalf of a client who specifically requests it acts in a professionally unreasonable manner per se." Gomez-Diaz v. United States, 433 F.3d 788, 791–92 (11th Cir. 2005) (citing Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000)).

As discussed earlier, the undersigned finds incredible Movant's testimony that Ms. Bozanic failed to file a requested notice of appeal. Although an interlocutory appeal on the pre-trial motions was originally planned, the strategy changed. The undersigned found that Movant was part of those discussions as to an interlocutory appeal.

In addition, as explained earlier, Movant reasonably understood that his guilty plea was conditioned upon a global resolution of his case. Further, the undersigned found that he demonstrated no interest in his appeals while continuing his correspondence with Ms. Bozanic.

Accordingly, Movant has not shown that Mr. Bozanic failed to file a requested notice of appeal. Thus, he failed to satisfy the burden of proof under section 2255. See Beeman v. United States, 871 F. 3d 1215, 1222 (11th Cir. 2017) (citing cases) (providing that movants bear the burden of proof under section 2255); Holsey v. Warden, Ga. Diagnostic Prison, 694 F. 3d 1230, 1256 (11th Cir. 2012) (explaining that movant bears burden of proof on ineffectiveness claim).

But this determination does not end the inquiry. Where, as evidently here, "the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken," courts next consider whether defense counsel "consulted with the defendant about an appeal." Flores-Ortega, 528 U.S. at 478. Consult under Flores-Ortega means "[]advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." Id.

Here, Movant has not shown that Mr. Bozanic failed to consult

with him regarding an appeal. When the appeal was being considered as an interlocutory appeal, Movant was part of the discussions. During negotiations for the plea deal, Ms. Bozanic went over the appellate waiver and talked to Movant about the fact that he was giving up his right to appeal the pre-trial motions. Because Movant failed to make an adequate foundation to support that Ms. Bozanic did not consult with him about the consequences of pleading guilty, Movant failed to show that Mr. Bozanic did not consult with him within the meaning of Flores-Ortega.

Moreover, even if Movant had adequately shown that Ms. Bozanic failed to consult with him, this would not have ended the inquiry. Counsel's failure to consult with the defendant about an appeal is not per se deficient. Flores-Ortega, 528 U.S. at 478, 480-81. "If counsel has not consulted with the defendant, the court must . . . ask . . . : whether counsel's failure to consult with the defendant itself constitutes deficient performance." Id. at 478.

In this regard, "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Id. at 480.

Regarding reason (2), Movant did not reasonably demonstrate interest in appealing. As to an interlocutory appeal, although Movant had an interest, he was part of the discussions to potentially reserve those appeals post-judgment. As to a post-judgment appeal, Movant never alerted trial counsel of his interest to pursue an appeal. While Movant alleges that he assumed the appeals were pending, he was found incredible on this point. As

such, it cannot be said that he reasonably demonstrated interest after accepting the plea deal. In fact, the lenient sentence received and the subsequent continued correspondence between Ms. Bozanic and Movant bolsters that Movant did not reasonably demonstrate interest in appealing.

Regarding reason (1), "[a]lthough not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." Flores-Ortega, 528 U.S. at 480. Courts "must [also] consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." Id.

In this case, as shown earlier, the voluntary guilty plea was entered into to end the proceedings by global resolution. The plea agreement offered dropping two counts in exchange for a guilty plea on one count for conspiracy to launder monetary instruments for a sentence of 108-months, or nine years, of incarceration. The district court imposed that recommended sentence to be followed by three years of supervisory release. (Cr-DE#72).

As such, had the Government obtained a guilty verdict on that count alone, the Court could have imposed a twenty-year sentence. (Cr-DE#3:7). In addition, had the Government obtained a guilty verdict on all counts, the Court could have imposed a life sentence as evidenced by the penalty sheet attached to the indictment.(Cr-DE#3:7). Thus, excluding the supervisory period imposed, Movant received what he bargained for to avoid the risk of a more onerous sentence—life imprisonment.

Finally, after reviewing the issues Movant wanted to appeal in the omnibus order denying his pre-trial motions (Cr-DE#57), the undersigned observes no error in the District Court Judge's reasoning or application of law. In sum, a rational defendant would not have wanted to appeal for fear of having the Government try to rescind the plea agreement and later obtain a more onerous sentence. For these reasons, claim 1 lacks merit.

## B. Ineffective Assistance - The "Extradition" Challenge

In his second claim, Movant contends his trial counsel was constitutionally ineffective for failing to argue that the indictment should be dismissed based on violations of the "1904/1905 and 1997 Treaty between Haiti and the United States." (DE#8:6). Counsel filed a motion to dismiss for lack of personal jurisdiction that contained the following language:

> It is acknowledged that there is an extradition treaty between Haiti and the United States[,] which has been signed in 1904 and in effect since 1905. That extradition treaty provides that neither the United States nor Haiti is obliged to surrender their own nationals... The United States went to a foreign country, disregarded Haiti's laws and abducted a Haitian citizen...
>
> Recognizing this case law [on extradition principles], counsel does not seek dismissal based upon a violation of the treaty between Haiti and the United States but rather, moves to dismiss because the conduct of the United States was so outrageous that an exception to the **Ker-Frisbie Doctrine** does indeed apply.

(Cr-DE#38:4, 6) (bolded text in original). In his memorandum in support, Movant wishes his trial counsel had focused on the rule of specialty based upon his assertion that trial counsel should have pointed out that the charges in the indictment were not enumerated

in the United States/Haiti treaties. Attempting to support this claim, Movant discusses a resolution from Haiti's senate unanimously finding that the United States violated the aforementioned treaties. Movant also relies upon procedural aspects as to how the extradition process functions to contend his "extradition" was not legally obtained. (DE#9:3). In Movant's reply, Counsel for Movant relies upon statements made by various political figures assessing the legality of his custody. (DE#27:4).

In order to discuss whether trial counsel was constitutionally ineffective, it requires a discussion of the applicable law trial counsel would have faced in presenting such a claim.

### 1. *Underlying Applicable Law*

Extradition is not the only method by which the United States can obtain custody of a foreign citizen. See <u>United States v. Gardiner</u>, 279 Fed. App'x 848 (11th Cir. 2008) ("An extradition treaty often is not the exclusive method by which the United States can obtain custody of a foreign citizen."). <u>See also</u> <u>Harden v. Pataki</u>, 320 F. 3d 1289, 1296 (11th Cir. 2003) ("the jurisdiction of a trial court over a criminal defendant is not vitiated by the violation of extradition procedures).

The procedures set forth in extradition treaties merely "provide a mechanism which would not otherwise exist, requiring, under certain circumstances, the [signatory countries] to extradite the individuals to the other country...**when the Treaty is invoked.**" Gardiner, 279 Fed. App'x at 848 (quoting United States v. Alvarez-Machain, 504 U.S. 655, 664-65 (1992)) (emphasis added).

As such, the Supreme Court has held that a district court has jurisdiction even if an individual's presence to stand trial was

obtained by forcible kidnapping. See Alvarez-Machain, 504 U.S. at 663. In reaching this conclusion, the Court relied upon precedent and general principles of treaty construction.

The U.S. Supreme Court has held that a defendant's "forcible abduction" from Peru was "no sufficient reason" why that individual should not answer to charges against him. Alvarez-Machain, 504 U.S. at 660-61 (discussing Ker v. Illinois, 119 U.S. 436, 444 (1886)). Thus, as the petitioner in Ker could not show governmental involvement existed in the effort to forcibly abduct him to stand trial, the United States Supreme Court concluded that forcible abductions do not necessarily invoke the terms of a treaty. Alvarez-Machain, 504 U.S. at 660-62 (discussing Ker, 119 U.S. 436, 444 (1886)).

However, Ker left a question unanswered, which was ultimately resolved in Alvarez-Machain: are treaty provisions invoked when governmental involvement occurred in the forcible abduction of an individual so that the abducted individual can stand trial? See id. The Court ultimately concluded that every case will depend upon the treaty at issue. See Alvarez-Machain, 504 U.S. at 662-63.

When interpreting a treaty, courts adhere to the text as if construing a statute. Alvarez-Machain, 504 U.S. at 663. As the relevant treaty in Alvarez-Machain did not explicitly state forcible abductions violated the treaty, the Court had to decide whether the treaty possessed an implied clause that neither country would resort to kidnapping or forcibly abducting foreign citizens for prosecution in their own country. See Alvarez-Machain, 504 U.S. at 664-66. The Court answered this question in the negative. See id. It reasoned that such an implied clause cannot exist merely by relying upon "the most general of international law principles[.]"

46

Id. at 679. As a result, this created a principle that a kidnapping or forcible abduction does not divest the federal courts of jurisdiction, notwithstanding that extradition procedures are not followed by the United States. Id. at 670. If, however, an extradition treaty explicitly prohibits forcible abduction or kidnapping in order to secure a defendant's presence for prosecution, then the federal government must exclusively resort to diplomatic methods (i.e. extradition procedures set forth in the treaty). Id. at 670.

In that same opinion, the U.S. Supreme Court also rejected the theory that federal courts are divested of jurisdiction to prosecute if the foreign government makes official findings, objects, or protests that one of their citizens was improperly abducted. See Alvarez-Machain, 504 U.S. at 667-68. Indeed, it is immaterial if the foreign country finds a forcible abduction offensive or disagrees with this United States's construction of the terms of the treaty. See id.

Additionally, in interpreting Alvarez-Machain, the Eleventh Circuit held that it is also irrelevant if a treaty partner's constitution contains a clause that forbids a citizen's removal from that country. United States v. Noriega, 117 F. 3d 1206, 1213 (11th Cir. 2017) (rejecting that the United States "kn[e]w or should have known that Panama's constitution prohibited the extradition of its nationals," as the foreign constitutional clause only "informs the United States of the hurdles it will face...such a provision says nothing about the treaty signatories' rights to opt for self-help (i.e. abduction) over legal process (i.e. extradition).") (parentheticals in original).

Finally, in this Circuit, countries may lawfully agree to

transfer a defendant to the United States despite the existence of a treaty (i.e. "extra-treaty seizures"). See United States v. Ceja, 543 Fed. App'x 948, 953 (11th Cir. 2013) (relying upon United States v. Arbane, 446 F. 3d 1223, 1225 (11th Cir. 2006) for the proposition that the Ker-Frisbie doctrine does not ban agreements between two countries when a treaty does not provide extradition as sole method of securing jurisdiction).

In sum, to prevail on a claim that a person was not extradited in conformity with the terms of a treaty, an individual must point to "the express language of a treaty" or "established practice thereunder" to demonstrate "that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner." United States v. Noriega, 117 F. 3d 1206, 1213 (11th Cir. 2017) (discussing United States v. Alvarez-Machain, 504 U.S. 655 (1992)).

### 2. *Was Extradition the Only Legal Method?*

As an initial matter, the Haitian government's objection to Plaintiff's abduction and prosecution are beyond the scope of what this Court must consider. See Alvarez-Machain, 504 U.S. at 667-68. So too, it is also beyond the scope of this Court's inquiry to consider whether any other provisions in the treaty or even the Haitian constitution imply that the Haitian government understood the terms of the treaty to forbid forcible abductions or other extra-treaty methods. See Noriega, 117 F. 3d at 1213.

The initial question this Court must ask is: Did the treaties between Haiti and the United States contain a clause either explicitly prohibiting forcible abduction or extra-treaty seizures or explicitly stating that extradition is the sole method to secure an individual's presence for prosecution in the foreign country.

<u>See</u> <u>Alvarez-Machain</u>, 504 U.S. at 667-68.

The answer is no. Such a provision does not exist in the 1904/1905 treaty[9] nor in the 1997 treaty.[10] Nor has Movant directed to this Court as to the existence of such a provision that would limit the United States to use only diplomatic methods. Consequently, the United States was not bound to exclusively resort to diplomatic methods (i.e. extradition procedures) to secure Plaintiff's presence for prosecution. Other methods, generally, would have been legal.

### 3. *Was Movant Extradited*?

During pre-trial, the United States Government asserted that Haitian Justice Minister to the Central Director of the Haitian Central Directorate of the Judicial Police provided a letter indicating that a transfer procedure was agreed upon after Movant was arrested by Haitian officials for other charges in Haiti.[11] (Cr-DE#44 at 3-5). Because the letter makes no mention of treaty provisions, extradition was not the method by which Movant's presence was secured. <u>See</u> <u>Valencia-Trujillo</u>, 573 F. 3d at 1179-81 (concluding treaty was not invoked due to the diplomatic note's failure to invoke the Colombia-United States treaty).

---

[9]  The 1904/1905 Treaty can be reviewed at 34 Stat. 2858 (1904). After reviewing this Treaty, the undersigned found that the Treaty merely provides for certain substantive and procedural requirements that should exist if and when the Treaty is invoked. It is silent as to whether extradition is the sole avenue by which a Movant's presence can be obtained.

[10] The 1997 Treaty can be reviewed at 2002 State Dept. No. 02-93 2002 WL 31504914. The 1997 Treaty contains no terms related to extradition. Further, there is no evidence that this Treaty was invoked in this case, rendering Movant's insistence that it applies meritless.

[11] This does not serve as commentary on the validity or invalidity of this official's actions in Haiti. It only shows that this Court cannot construe this letter to mean the treaty was invoked.

Therefore, as extradition was not the only legal method to secure Movant's presence, the letter fails to invoke treaty principles. See Alvarez-Machain, 504 U.S. at 667-68; Valencia-Trujillo, 573 F. 3d at 1179-81. See also United States v. Ceja, 543 Fed. App'x 948, 953 (11th Cir. 2013) (holding that an "extra-treaty seizure" is permissible under the Ker-Frisbie doctrine). As a result, Plaintiff's presence was obtained via a non-treaty agreement or, in the alternative, via forcible abduction. Either way, his presence was secured lawfully under the Ker-Frisbie doctrine.

4. *Does a Treaty Doctrine or Other Exception Apply ?*

Because Movant's presence was not secured by treaty, treaty-based doctrines like the rule of specialty are inapplicable to him. See United States v. Valencia-Trujillo, 573 F. 3d 1171, 1179-81 (11th Cir. 2009). Thus, contrary to Movant's contention, he lacks standing to invoke the rule of specialty. See id. ("Because Colombia's extradition of Valencia-Trujillo to the United States was not based on an extradition treaty between the two countries[,] Valencia-Trujillo lacks standing to assert the rule of specialty.").

Similarly, because the treaty was not invoked, failure to adhere to various extradition procedures is also irrelevant. See Alvarez-Machain, 504 U.S. at 668-69 ("[T]o infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice.").

As stated earlier, although Haiti's officials have made formal protests and determined that the United States violated the Treaty, that issue is not within the scope of this Court's review. See id.

at 667 ("The Extradition Treaty has the force of law, and...it
would appear that a court must enforce it on behalf of an
individual regardless of the offensiveness of the practice of one
nation to the other nation."). Thus, contrary to Movant's
contention in his reply (DE#27:5), it does not serve as improper
commentary on the legitimacy of those actions in Haiti.[12]

5. *Ineffective Assistance of Counsel Analysis*

Understanding these principles of obtaining a foreign
individual's presence for prosecution, Movant cannot show that
trial counsel was constitutionally ineffective.

The Sixth Amendment affords a criminal defendant the right to
"the Assistance of Counsel for his defen[s]e." U.S. Const. amend.
VI. "The benchmark for judging any claim of ineffectiveness must be
whether counsel's conduct so undermined the proper functioning of
the adversarial process that the trial cannot be relied on as
having produced a just result." Strickland v. Washington, 466 U.S.
668, 686 (1984). To prevail on a claim of ineffective assistance of
counsel, a habeas petitioner must demonstrate both (1) that his
counsel's performance was deficient, and (2) a reasonable
probability that the deficient performance prejudiced the defense.
Strickland, 466 U.S. at 687. An ineffective assistance of counsel
claim may be raised with respect to errors made by trial counsel or
direct appeal counsel, and both are governed by Strickland. See,

---

[12] The act of state doctrine precludes federal courts from inquiring into
the validity of the public acts of a recognized foreign sovereign power committed
within its own territory. Glen v. Club Mediterranee, S.A., 450 F.3d 1251, 1253
(11th Cir. 2006) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401
(1964)). It provides that "acts of foreign sovereigns taken within their own
jurisdictions shall be deemed valid." Glen, 450 F. 3d at 1253 (internal quotation
marks omitted). However, it applies **only when the outcome** of the case **turns upon
the effect of official action by a foreign sovereign.** W.S. Kirkpatrick & Co. v.
Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 406 (1990) (emphasis added). As
shown in this report, the official action has no effect on this Court's review,
revealing this doctrine is inapplicable to Movant.

e.g., Raleigh v. Sec'y, Fla. Dep't of Corr., 827 F. 3d 938, 957
(11th Cir. 2016), cert. denied, Raleigh v. Jones, 137 S. Ct. 2160
(2017) ("The Strickland standard for ineffective assistance of
[trial] counsel governs claims of ineffective assistance of
appellate counsel.").

    In assessing whether a particular counsel's performance was
constitutionally deficient, courts indulge a strong presumption
that counsel's conduct falls within the wide range of reasonable
assistance. Strickland, 466 U.S. at 689 ("Judicial scrutiny of
counsel's performance must be highly deferential."). Generally
speaking, reasonableness is evaluated under "prevailing
professional norms." Strickland, 466 U.S. at 688. But, in order to
"eliminate the distorting effects of hindsight," and to be
consistent in acknowledging there are "countless ways to provide
effective assistance in any given case," courts must not engage in
"intensive scrutiny [or apply] rigid requirements." Strickland, 466
U.S. at 689-90. By doing so, it would intrude upon "counsel's
independence" and "restrict the wide latitude counsel must have in
making tactical decisions." Strickland, 466 U.S. at 689.

    Regarding trial counsel's performance, trial counsel did the
best job possible under the circumstances. Because courts are
reluctant to second-guess strategic decisions made by counsel,
trial counsel is presumed to have provided adequate performance.
See, e.g., Bates v. Sec'y, Fla. Dep't of Corr., 768 F. 3d 1278,
1298 (11th Cir. 2014). Reasonable lawyers could disagree about the
best strategy, but that is not the question on habeas review. See
id. Indeed, "[t]he Sixth Amendment guarantees reasonable
competence, not perfect advocacy with the benefit of hindsight."
Yarborough v. Gentry, 540 U.S. 1, 8(2003).

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he [or she] did so for tactical reasons rather than sheer neglect." Id. (relying upon Strickland, 466 U.S. at 690). This presumption wields "particular force where" the ineffective-assistance claim is based "solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'" Yarborough, 540 U.S. at 8 (quoting Massaro v. United States, 538 U.S. 500, 505 (2003)).

Trial counsel, demonstrating candor to the Court, acknowledged the case law that cut against presenting a claim under extradition principles. (Cr-DE#38:3-4) ("Recognizing this case law, counsel does not seek dismissal based upon a violation of the treaty between Haiti and the United States..."). Instead, the motion to dismiss presented a good faith argument that precedent from another circuit should apply in this circuit as well. (Cr-DE#38:4). Thus, this Court must presume that trial counsel did so for strategic reasons. See Yarborough, 540 U.S. at 8. Accordingly, Movant cannot meet his burden of showing deficient performance by expressing his mere disagreement with trial counsel's strategy.

Nor could Movant show that he was prejudiced by trial counsel's strategy. To demonstrate prejudice, petitioners must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A probability that is reasonable is defined as "a probability sufficient to undermine confidence in the outcome." Id. As explained earlier, Movant's presence did not need to be secured by extradition principles. Other legal avenues were available. Observing that the underlying merit of Movant's proposed arguments would have failed, trial

counsel cannot be deemed ineffective for making good faith arguments that an extension should have applied over the meritless arguments Movant proposes. See, e.g., Denson v. United States, 804 F. 3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance."). Thus, Movant cannot satisfy any prong under Strickland.

The undersigned addresses one final point raised by Counsel for Movant. In a supplement, Counsel for Movant submits that Article 1.1 of the United Nations Convention Against Torture applied and should have been argued by trial counsel in the motion to dismiss.[13] Yet, Counsel for Movant provides no legal citation to indicate that an attorney could be constitutionally ineffective for failing to make such an argument. Nor has Counsel for Movant provided any citation to indicate that such an argument would have been cognizable. It appears Counsel for Movant invokes the most general of international law principles, see Alvarez-Machain, 504 U.S. at 679, in hopes that something might stick.

It does not. The undersigned's research—on the issue of any connection between the Convention and ineffective assistance of counsel claims related to extradition principles—yielded no relevant results. Accordingly, Movant has failed to carry his burden that his counsel was constitutionally ineffective, rendering Claim two meritless.

## C. Ineffective Assistance-Failing to Investigate and Present Evidence on Speedy Trial Violation

In Claim Three, Movant contends that his trial counsel was ineffective for failing to investigate and present evidence to

---

[13] The undersigned assumes that Counsel for Movant relies upon the Convention to argue that Movant's presence was obtained by "torture," ergo, trial counsel should have argued that this Court somehow lacked personal jurisdiction in securing Movant's presence.

support a claim that his speedy trial rights were violated. In support, he relies upon various exhibits. Entry of a guilty plea waives all non-jurisdictional defects occurring prior to the time of the plea, including violations of a defendant's rights to a speedy trial and due process. <u>E.g.</u>, <u>Tiemens v. United States</u>, 724 F. 2d 928, 929 (11th Cir. 1984). <u>See also</u> <u>United States v. Wilson</u>, 292 Fed. App'x 895, 897 (11th Cir. 2008).

Here, trial counsel was found credible for explaining to Movant that his guilty plea operated as a global resolution of the case, and the underlying criminal record shows nothing indicating that Movant did not understand that. As such, unlike <u>Pierre</u>, where the record demonstrated that Mr. Pierre entered his guilty plea based on the reasonable but mistaken belief that his speedy trial issue was preserved for appeal, this case is distinguishable. <u>See</u> <u>United States v. Pierre</u>, 120 F. 3d 1153, 1155-56 (11th Cir. 1997). Movant knew what he bargained for. In the alternative, Movant has failed to carry his burden in showing that he did not know that he waived this issue by pleading guilty. Accordingly, this claim has been waived.

## VII. <u>CERTIFICATE OF APPEALABILITY</u>

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." <u>Id.</u> "If the court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." <u>Id.</u> "A timely notice of appeal must be filed even if the district court issues a certificate of appealability." Rule 11(b), Rules Governing

§ 2255 Proceedings.

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects a movant's constitutional claims on the merits, "a petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). In contrast, "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

Thus, habeas litigants need not show that an appeal would succeed among some jurists. Miller-El v. Cockrell, 537 U.S. 322, 337 (2003). After all, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 338.

After considering the arguments and underlying criminal record, the Court should deny a certificate of appealability. If Movant disagrees, he may express that disagreement in any objections filed with the district court.

## VIII. <u>RECOMMENDATIONS</u>

Based on the foregoing, it is recommended:

1. That Movant's section 2255 motion (DE#8) be **DENIED**;

2. That no certificate of appealability issue; and

3. That judgment be entered and the case closed.

Objections to this report may be filed with the district judge within fourteen days of receipt of a copy of the report. Failure to file timely objections shall bar movant from a de novo determination by the district judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge except upon grounds of plain error or manifest injustice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985); <u>RTC v. Hallmark Builders, Inc.</u>, 996 F. 2d 1144, 1149 (11th Cir. 1993).

SIGNED this 11th day of September, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

Copies furnished:

Michael James Rosen
Michael J. Rosen

201 South Biscayne Boulevard
Suite 915
Miami, FL 33131
305-446-6116
Fax: 305-448-1782
Email: mjr@mjrosenlaw.com
Counsel for Movant

Philip E. Pitzer
30 Garfield Place
Suite 1000
Cincinnati, OH 45202
310-902-8796
Fax: 421-3043
Email: philipepitzer@aol.com
Counsel for Movant
Pro Hac Vice

Lynn M. Kirkpatrick
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
305-961-9239
Fax: 305-536-7213
Email: Lynn.Kirkpatrick@usdoj.gov

Noticing 2255 US Attorney
Email: usafls-2255@usdoj.gov