```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 18-CV-20541-ALTONAGA
 3

 4    GUY PHILLIPE,                     Miami, Florida

 5           Plaintiff,                 August 28, 2018

 6    vs.                               9:35 a.m. to 12:40 p.m.

 7    UNITED STATES OF AMERICA,         Pages 1 to 108

 8            Defendant.
      _____

 9

10                        MOTION HEARING
             BEFORE THE HONORABLE PATRICK WHITE
11              UNITED STATES MAGISTRATE JUDGE

12
      APPEARANCES:
13

14    FOR THE PLAINTIFF:      PHILIP E. PITZER, ESQ.
                              1700 West Avenue
15                            Suite 427
                              Miami Beach, Florida  33139
16

17    FOR THE DEFENDANT:      LYNN KIRKPATRICK, ESQ.
                              ANDY CAMACHO, ESQ.
18                            UNITED STATES ATTORNEYS OFFICE
                              ASSISTANT UNITED STATES ATTORNEY
19                            99 Northeast Fourth Street
                              Miami, Florida 33132
20

21    STENOGRAPHICALLY REPORTED BY:

22                            PATRICIA DIAZ, FCRR, RPR, FPR
                              Official Court Reporter
23                            United States District Court
                              400 North Miami Avenue
24                            11th Floor
                              Miami, Florida 33128
25                            (305) 523-5178
                              I N D E X
```

```
                                    Direct   Cross   Redirect

WITNESSES FOR THE DEFENDANT:

MARK O'BRIEN
BY MR. PITZER                         3
BY MR. CAMACHO                                  5

RACHEL REESE
BY MR. PITZER                         7
BY MS. KIRKPATRICK                             10

JUNIOR MAXI
BY MR. PITZER                        13
BY MR. CAMACHO                                 19

NATALIE PHILLIPE
BY MR. PITZER                        27              40
BY MR. CAMACHO                                 34

GUY PHILLIPE
BY MR. PITZER                        41
BY MS. KIRKPATRICK                             57

ZELJKA BOZANIC
BY MR. PITZER                        74
BY MS. KIRKPATRICK                             83  (Direct 84)
```

INDEX OF EXHIBITS


Government's Exhibit 8 admitted in evidence      Page 99

Government's Exhibits 1 through 5 in evidence      Page 101

```
 1              (Call to the Order of the Court.)

 2         THE COURT:  Please be seated.

 3         COURTROOM DEPUTY:  Please all be seated.  Case number

 4   18-20541-CV-Altonaga, Guy Phillippe versus United States of

 5   America.

 6         Counsel, please state your name for the record.

 7         MS. KIRKPATRICK:  Good morning, Your Honor, Lynn

 8   Kirkpatrick and Andy Camacho for the United States.

 9         MR. PITZER:  Good morning, Your Honor, Philip Pitzer

10   for the petitioner.

11         THE COURT:  Any issues we need to take up before we

12   begin?

13         MS. KIRKPATRICK:  Your Honor, I would only say that the

14   Government has one witness on its witness list, trial counsel.

15         My preliminary discussion with plaintiff's counsel is

16   that he also intends to call her.

17         She had a prior commitment in Broward at 9:30 but

18   assured me she would be here approximately 10:15, 10:30.  I

19   just wanted to alert the Court to that timing issue.

20         THE COURT:  All right.  Counsel, if you would.

21         MR. PITZER:  We have none other than that same issue,

22   Your Honor.

23         THE COURT:  How many witnesses will you be calling?

24         MR. PITZER:  It will be a total of five but they will

25   all be brief.
```

```
 1              THE COURT:  Okay.  You don't have to rush.

 2              MR. PITZER:  I won't.

 3              THE COURT:  It's your day.

 4         Okay.  Anything else that we need to take up before we

 5    take the first witness?

 6              MS. KIRKPATRICK:  Nothing from the Government, Your

 7    Honor.

 8              MR. PITZER:  Nothing, Your Honor.

 9              THE COURT:  Counsel, call your first witness.

10              MR. PITZER:  Yes, at this time, Your Honor, we would

11    call Mark O'Brien.

12              (The witness, Mark O'Brien, was duly sworn.)

13              COURTROOM DEPUTY:  Please take a seat.  Please state

14    your name and spell your last name for the record.

15              THE WITNESS:  Mark O'Brien, O'-B-R-I-E-N.

16              COURTROOM DEPUTY:  Thank you, sir.

17                         DIRECT EXAMINATION

18    BY MR. PITZER:

19    Q.  Mr. O'Brien, you are an attorney.  Is that correct?

20    A.  I am.

21    Q.  Your offices are located where?

22    A.  Tampa, Florida.

23    Q.  Is it a fair statement that your firm specializes and does

24    exclusively criminal law?

25    A.  I cannot use the word specialize but exclusively, yes.
```

1    Q.   Would you tell the Court how you came to be involved with

2    Guy Phillippe?

3    A.   I believe Mr. Phillippe was either a cell mate or a bunk

4    mate of a client that I had that was being prosecuted in the

5    Southern District.  I traveled to see that client quite a bit,

6    and Mr. Phillippe asked to see me regarding a legal question

7    that he had.  I did that as a courtesy to him and his friend,

8    who was my client.

9         THE COURT:  Okay.  Can I suggest the microphone sit

10   closer to you?  You are kind of soft spoken.

11   BY MR. PITZER:

12   Q.   Mr. O'Brien, for the record, Mr. Phillippe has waived his

13   attorney-client privilege.

14        At this time I ask you what conversations you had with

15   Mr. Phillippe when you saw him at the detention center?

16   A.   Mr. Phillippe inquired whether my firm handles appellate

17   issues.  I told him that we did.  We have a lawyer that does

18   that.  Her name is Rachel Reese.  He asked me whether or not he

19   could file a notice of appeal or whether an appeal had been

20   filed.

21        I told him I didn't know because I didn't know anything

22   about his case but I would look into it, and it gave me an

23   understanding of what happened in his case.  He filed, I

24   believe, a motion to dismiss based upon a statute of

25   limitations argument.

1       It appeared it was some sort of money laundering case and

2  there were several pretrial motions, according to him -- these

3  are my notes -- and I got back to the office either later that

4  day or the next day and instructed Ms. Reese to look into it.

5  Q.   And Ms. Reese took over from that point forward?

6  A.   She did.  She did.

7       MR. PITZER:  That's all I have for this witness, Your

8  Honor.

9       THE COURT:  Okay.  Government.

10                      CROSS-EXAMINATION

11 BY MR. CAMACHO:

12 Q.   Good morning, Mr. O'Brien.

13 A.   Good morning, sir.

14 Q.   In the course of a question just now in direct, you

15 indicated that you met briefly with Mr. Phillippe.  Is that

16 correct?

17 A.   I did.  That was on, it looks like, August 6th, 2017, and

18 that was at the FDC here in Miami.

19 Q.   Were you present for any of the conversations that

20 Mr. Phillippe had with his defense lawyers Ms. Bozanic and

21 Mr. Ross?

22 A.   I don't even know who those individuals are, no, I was not.

23 Q.   Other than what Mr. Phillippe told you in August of 2015,

24 you have no knowledge of what happened in this case?

25 A.   No knowledge at all.

 1   Q.   Did you have any further contact with Mr. Phillippe post

 2   that preliminary interview?

 3   A.   I looked at my calendar and I looked at my notes and the

 4   only conference -- and I take notes for every time that I meet

 5   with my client.  The only time I met with him was August

 6   the 6th, 2017, I believe.

 7   Q.   At any point in time did you inform Mr. Phillippe whether

 8   an appeal had been filed or not?

 9   A.   I don't think I had any additional -- I don't do the

10   appeals in my law firm or the appellate issues, so from my

11   understanding, and from my notes, when I returned to the office

12   either later on August 6th or the following day August 7th, I

13   directed Ms. Reese to look into whether or not an appeal had

14   been filed.  And I don't believe I had any additional -- I

15   didn't do any additional legal work on this case.

16   Q.   To the extent your law firm had any involvement with

17   Mr. Phillippe, it would have been at the earliest date,

18   August 6th, 2017?

19   A.   That is the date on my notes.

20        MR. CAMACHO:  Thank you, sir.  No further questions,

21   Your Honor.

22        MR. PITZER:  No further questions.

23        THE COURT:  Just so I understand, your participation in

24   this matter was simply to see if an appeal had been filed,

25   that's it?

```
 1              THE WITNESS:  Essentially, Judge, what I gave
 2   Mr. Phillippe was a consultation, and during the consultation
 3   he asked me whether or not an appeal had been filed in his
 4   case.  Clearly, I didn't know.  So, I won't went back into the
 5   office and directed Ms. Reese to check whether or not an appeal
 6   had been filed.
 7              THE COURT:  Okay.
 8              MR. CAMACHO:  No further questions, Your Honor.  Thank
 9   you.
10              MR. PITZER:  Thank you, Mr. O'Brien.
11              THE WITNESS:  May I be excused, Your Honor?
12              THE COURT:  You may be excused.
13              MR. PITZER:  The next witness we will call is Rachael
14   Reese.
15              (The witness, Rachael Reese, was duly sworn.)
16              COURTROOM DEPUTY:  Please take a seat.  Please state
17   your name, and spell your last name for the record.
18              THE WITNESS:  Rachel Reese, R-E-E-S-E.
19              COURTROOM DEPUTY:  Thank you.
20                          DIRECT EXAMINATION
21   BY MR. PITZER:
22   Q.  You are an attorney.  Is that correct?
23   A.  Yes.
24   Q.  And you practice with the firm of O'Brien and Hatfield?
25   A.  Yes, sir.
```

1    Q.   And your firm is in Tampa, Florida.  Is that correct?

2    A.   Yes.

3    Q.   Do you know this gentleman, Guy Phillippe?

4    A.   I do.

5    Q.   Would you tell the Court how you had the occasion to meet

6    him?

7    A.   I met Mr. Phillippe in -- well, my law partner met with him

8    in August of last year, and then I had the opportunity to speak

9    with Mr. Phillippe over the phone.  I remember it was right

10   before the hurricane up in Tampa, so it was September of last

11   year.  And I came to speak with him because a question had

12   arisen of whether or not an appeal had been filed on his behalf

13   and if one had not been filed what options would be available

14   to him.

15        So, I spoke to Mr. Phillippe to figure out some more

16   information about his case, when I learned there had not been a

17   notice of appeal filed.

18   Q.   And your communication with Mr. Phillippe was by telephone.

19   Is that my understanding?

20   A.   Yes.

21   Q.   And you looked into whether or not an appeal had been

22   filed?

23   A.   That's correct.  My law partner had met with him at the

24   jail in South Florida, and then I looked into the issue of

25   whether or not an appeal had been filed.  And one had not been

1    filed.

2    Q.   Your law partner is Mark O'Brien.  Is that correct?

3    A.   Yes.

4    Q.   After you learned that, in fact, an appeal had not been

5    filed, what, if any, additional advice or counsel did you give

6    Mr. Phillippe?

7    A.   When I first advised him that an appeal had not been filed,

8    because I don't think he was actually aware of that fact until

9    I told him, we went over the facts of his case and then I kind

10   of did some background research into the documents that had

11   been filed.

12       I looked at any sort of plea agreement to make sure that he

13   hadn't waived any of his rights to appeal, and during our

14   conversations earlier this year, after the new year we spoke

15   about the possibility of filing a 2255 because an appeal had

16   not been taken and because he did not -- it was my

17   understanding that he had wanted an appeal to be filed on his

18   behalf.

19   Q.   All right.  Did you pursue that for him?

20   A.   I did draft a 2255 petition for Mr. Phillippe and I sent

21   him a copy of it.  A couple of weeks after that I actually set

22   up a phone conversation with him.  His facility was a little

23   difficult to set up legal telephone conferences with.  It

24   wasn't one where you could call and get one immediately.  It

25   was normally a week or two out you had to put the request in.

1    And during my phone conversation with him, I simultaneously

2    looked in the clerk's website and I was shocked to see that one

3    had already been filed and it was, obviously, not the draft

4    that I sent him, so at that point I asked him about that.

5    Q.  When you indicated to Mr. Phillippe that you had determined

6    that an appeal had not been filed for him, did he respond to

7    that news in any fashion?

8    A.  He did.  He was -- I don't want to say he was upset but he

9    was definitely concerned because his understanding was that his

10   family had hired an additional attorney to specifically assist

11   him with his appeal.  So, he was definitely concerned wanting

12   to know if there were a way to somehow get the appeal started

13   at that point, and this was in September still of last year.

14   So, it was definitely a concern.  He wasn't, you know, grossly

15   upset but definitely it was an issue for him.

16        MR. PITZER:  That's all I have for the witness, Your

17   Honor.

18        THE COURT:  Government.

19                  CROSS-EXAMINATION

20   BY MS. KIRKPATRICK:

21   Q.  Good morning, Ms. Reese.  You indicated you first spoke to

22   Mr. Phillippe via phone in September of 2017?

23   A.  That's correct.

24   Q.  So just a few months after his plea?

25   A.  Correct.

```
1    Q.   What was the time frame of the 2255 that you sent him, I
2    believe you said it was after the beginning of the year?
3    A.   It was.  So, I went -- it's ironic because I remember the
4    first time I spoke to him so vividly.
5         I was in the Walgreens drive-thru because the hurricane was
6    coming to Tampa.  It was the second week in September.  I spoke
7    to him.  I said, have your family send me your documents.  Then
8    I would go through everything.  I was going to send him a
9    waiver so I can get any documents from any foreign
10   organizations I might have an issue with.  It took me almost a
11   week to get documents from family members and, obviously, my
12   office was specifically closed because of the hurricane for
13   about two weeks.  That was in about October.
14        When I spoke to him in January, I had finally gone through
15   everything.  I had gone through all of the motions that had
16   been filed with the Court.  I had gone through the other
17   documents that his wife had sent me.  At that point, I told him
18   I genuinely thought there was an issue that he could raise on
19   his appeal, if an appeal would be taken.  That's when I said,
20   are you giving me the go ahead to draft a petition for you.
21   Q.   When did you tell him a notice of appeal had not been
22   filed?
23   A.   During our phone conversation in September.
24   Q.   In September of 2017?
25   A.   Correct.
```

```
 1   Q.   And you indicated when you told him that he was -- I

 2   believe you used the word "concerned" because his family had

 3   hired another attorney to file an appeal.

 4        Did he indicate to you who that was?

 5   A.   During my conversations with him, what I understood was

 6   that he had had a female attorney and they had spoken about the

 7   motions that had been filed and whether or not those were

 8   something that he could appeal.  He understood that she would

 9   not be doing -- wasn't willing to do the appeal so he needed to

10   hire somebody else.  That's when he hired Alan Ross.

11        So, when I learned that information, I actually went online

12   to the clerk's website to kind of verify that because I handle

13   only post-conviction and appeal issues so sometimes I get

14   told -- I try to fact check as much as possible.

15        So, I went online.  I saw that his name was actually listed

16   as one of the counsel in his case and then I kind of did some

17   research on the Florida website to see what kind of law he

18   practiced, that kind of thing.

19   Q.   So your understanding from the defendant was that he had

20   hired Mr. Ross to file a postconviction appeal?

21   A.   No, it was that he had come on to assist with the appeal

22   while his case was still pending.

23   Q.   Before the plea?

24   A.   Correct.

25   Q.   Did he indicate that he had hired anyone after his plea of
```

1    guilty to file an appeal or did you locate such person?

2    A.   I don't think so.

3    Q.   Just so we are clear, you did not get into this case before

4    the defendant's plea or sentencing.  Correct?

5    A.   Correct.

6    Q.   You were not involved with any conversations with

7    Ms. Bozanic or Mr. Ross?

8    A.   Correct.

9    Q.   Aside from the documents that you pulled from the docket

10   sheet, the only knowledge you have in this case is from the

11   defendant -- I'm sorry, the plaintiff in this matter,

12   Mr. Phillippe?

13   A.   Correct.  As well as some documents that I had been sent

14   from his wife.

15            MS. KIRKPATRICK:  Okay.  Thank you.

16            I have nothing further, Your Honor.

17            MR. PITZER:  Nothing further from the witness, Your

18   Honor.

19            THE WITNESS:  Thank you, Your Honor.

20            MR. PITZER:  Thank you very much.

21            COURTROOM DEPUTY:  Please raise your right hand.

22            (The witness, Junior Maxi, was duly sworn.)

23            THE COURT:  Please take a seat.

24            COURTROOM DEPUTY:  Please state your name and spell

25   your last name for the record.

```
 1              THE WITNESS:  Junior Maxi.

 2              MR. PITZER:  You need to speak into the microphone,

 3    sir.

 4              COURTROOM DEPUTY:  Spell your last name, please.

 5              THE WITNESS:  M-A-X-I.

 6                         DIRECT EXAMINATION

 7    BY MR. PITZER:

 8    Q.  Mr. Maxi, where do you reside?

 9    A.  New York.

10    Q.  You are going to have to speak into the microphone so we

11    can hear, please.  Say again.  Where do you reside?

12    A.  New York.

13    Q.  And your address?

14    A.  110-11 213 Street.

15    Q.  How do you have the occasion to know Guy Phillippe?

16    A.  We growing up together.

17    Q.  You grew up together?

18    A.  Yes.

19    Q.  That was in Haiti?

20    A.  Yes.

21    Q.  And how did you happen to become involved in

22    Mr. Phillippe's criminal matter?

23    A.  So on 2005 he got arrested so I supposed to go in Haiti.

24    So me and him --

25    Q.  Slow down.  Slow down so we can get all of this.  Go ahead.
```

1    A.   So, after he got arrested so we get in touch by his wife.

2    After that we like -- I'm sorry.

3    Q.   Let me see if I am understanding this.  When Guy got

4    arrested, you contacted his wife?

5    A.   Yes.

6    Q.   And his wife is Natalie?

7    A.   Yes.

8    Q.   Is that correct?

9    A.   Yes.

10    Q.   What happened then?

11    A.   So after, I got involved.  So I get involved with like, you

12    know, get in touch with a lawyer, whatever is happening.

13    Q.   Okay.  Just slow down.

14         You got involved and you got in contact with a lawyer?

15    A.   Yes.

16    Q.   What lawyer did you contact?

17    A.   Not me contact the lawyer.  So I got contact with lawyer

18    after like, you know, we have to pay lawyer on the end.

19    Q.   Understood.  But who was the lawyer?

20    A.   Zeljka.

21    Q.   Do you know Zeljka's last name?

22    A.   Bozanic or something like that.

23    Q.   How did you find this lawyer?

24    A.   I don't find the lawyer, sir.  I think his wife maybe, not

25    me.

1   Q.   So you don't know for sure?

2   A.   No.

3   Q.   Did you have communications with Ms. Bozanic?

4   A.   First time I got in contact with her I think that was like

5   June 6th after the case, after the sentence.  Yes, that's the

6   first time I got contact with her for payment.

7   Q.   So you were involved with paying her.  Is that correct?

8   A.   Yes.

9   Q.   As the case progressed, did you keep track of the case and

10  what was going on in the case?

11  A.   Yes.  After I spoke to her the first time, she called me.

12  She got my phone number from Guy, so she called me for a

13  payment.  So after we finished talking about payment I told

14  her -- we spoke about the plea agreement too because she is

15  supposed to do a plea -- not a plea, how you call it, like -- I

16  forgot what you call it.  She is supposed to do like, you

17  know -- I forgot to call it.  So she is supposed to do -- I

18  forgot what you call it for him, okay.

19          MS. KIRKPATRICK:  Your Honor, if I may.  Perhaps it

20  would be easier with the Creole interpreter if the witness

21  is -- because we are having a hard time understanding some of

22  the words that the witness is using.

23          THE INTERPRETER:  Let me ask him.

24          He will speak in Creole.

25          THE COURT:  I am not sure he is having a hard time

```
 1   understanding.  I think he is just looking for the word

 2   "appeal" maybe.

 3            THE WITNESS:  Yes, that is exactly.

 4            MR. PITZER:  I think so too.

 5            I didn't feel at liberty to coach him.

 6            THE WITNESS:  Thank you, sir.

 7            MS. KIRKPATRICK:  Thank you, Your Honor.

 8            THE COURT:  I don't think we need to do that.

 9            MS. KIRKPATRICK:  Your Honor, I would defer to the

10   witness, whatever he is more comfortable in.

11            THE WITNESS:  That's fine.

12            I got the word from the -- it was just the appeal.

13            THE COURT:  I am not going to testify for you.  Just

14   take your time.

15   BY MR. PITZER:

16   Q.  All right.  We think we were at a point where you were

17   keeping track of the case.  Right?

18   A.  Yes.

19   Q.  And there was some discussion about an appeal.  Is that a

20   fair statement?

21   A.  Yes.

22   Q.  And what do you recall the conversation being in regard to

23   an appeal?

24   A.  What was happening.  After I spoke to her for the payment

25   to make arrangement, I am going to pay her.  So, on the first
```

```
 1    call, the second time when I spoke to Guy he tell me, did you
 2    tell her about the appeal.  I said, okay.  Yes, I text her and
 3    I tell her to call me.  She did -- she did call me back.
 4        We talked about the money, whatever that I am going to pay
 5    her.  After that I tell her, don't forget, Guy tell me to
 6    follow on the appeal for him.
 7    Q.  Did she respond to that?
 8    A.  Yes.
 9    Q.  What did she say?
10    A.  She tell me the case is over now so she just looking for
11    the payment.  After that I got to get another lawyer for the
12    appeal because she is no longer his lawyer.  I said that's
13    fine.
14    Q.  So the conversation that you are relating to us now
15    happened after Guy was found or entered his plea and was
16    sentenced and you were now communicating with Zeljka about
17    further payment on her fee.  Is that correct?
18    A.  Yes.
19    Q.  And that's the time when you brought up the appeal?
20    A.  Yes.  Actually, she is supposed to have done the appeal
21    because we know she is going to do the appeal event like when
22    the case is over.  So the appeal still keep going.
23    Q.  Okay.  So now you are trying to find out what's going on
24    with the appeal.  Correct?
25    A.  Yes.
```

```
 1   Q.   And she told you -- I am going to ask you to repeat it but
 2   what did she tell you at that point?
 3   A.   I have to get another lawyer.  At that time, we got in
 4   touch with -- I think his name is O'Brien.
 5   Q.   She told you to get in touch with another lawyer?
 6   A.   For the appeal, yes.
 7   Q.   That's when there was communication with Mark O'Brien and
 8   his law firm?
 9   A.   Yes.
10   Q.   Okay.  When Ms. Bozanic originally got involved with the
11   case, do you know if there was any type of fee agreement?
12   A.   The fee, no, I am not sure.
13   Q.   So you never saw a fee agreement?
14   A.   No.
15   Q.   After you spoke with Ms. Bozanic, did you at any time speak
16   to Guy about the fact that his appeal had not been filed?
17   A.   No.
18   Q.   You did not?
19   A.   No.
20        MR. PITZER:  Okay.  That's all I have for the witness,
21   Your Honor.
22        THE COURT:  Okay.  Government.
23                      CROSS-EXAMINATION
24   BY MR. CAMACHO:
25   Q.   Good morning, Mr. Maxi.
```

1        I wanted to go over the -- you indicated the first time you

2   spoke to Ms. Bozanic was on June 6th, 2017?

3   A.   Yes.

4   Q.   Prior to that, no conversations whatsoever with

5   Ms. Bozanic?

6   A.   No.

7   Q.   Were you present at any point in time for any conversations

8   that Ms. Bozanic had with Mr. Phillippe at the time of his

9   change of plea?

10  A.   If I what?

11  Q.   Were you -- prior to June 6th, 2017, were you present in

12  any meetings between Ms. Bozanic and Mr. Phillippe?

13  A.   No.

14  Q.   Do you know when Mr. Phillippe entered a change of plea?

15  A.   No.

16  Q.   Do you know when he was sentenced?

17  A.   I forgot the date.

18  Q.   Because you indicated that you had been following the case.

19  Is that still accurate?

20  A.   Yes.

21  Q.   Could you walk us through in terms of -- you said you had

22  two series of conversations or contact with Ms. Bozanic?

23  A.   Yes.

24  Q.   You said the first time was regarding payment?

25  A.   Yes, that's why she contacted me for the first call.

```
 1   Q.   Was this in June of 2017?

 2   A.   Yes.

 3   Q.   When did the first time occur?

 4   A.   I am pretty sure that was on the 8th.

 5   Q.   June 8th?

 6   A.   Yes.

 7   Q.   Did you pay Ms. Bozanic at any point in time?

 8   A.   Yes, sir.

 9   Q.   How did that payment occur?

10   A.   She gave me the account number.

11   Q.   What did you do?

12   A.   Deposit money for her.

13   Q.   And how did you deposit it, check, cash, wire?

14   A.   It is a wire.

15   Q.   You took a moment.

16        Do you recall when that occurred or how it occurred?

17   A.   Say again.

18   Q.   Do you recall how you made the payment that you testified

19   to?

20   A.   Yes, I said I wired the money for her.

21   Q.   You wired the money from your personal checking account?

22   A.   I don't remember exactly.  So I think I do the deposit

23   because I have a Chase account so you cannot do Chase between

24   her account.  So I got to go to the account to do a money order

25   and deposit on her account.
```

```
 1    Q.   And when was this payment made, approximately?

 2    A.   I don't remember exactly.

 3    Q.   How much was it?

 4    A.   I do a first payment I think like -- I am pretty sure the

 5    first one was like 3,000, if I remember.

 6    Q.   Was there a second payment?

 7    A.   Yes, I do two payments for her.  I don't remember exactly

 8    the amount.

 9    Q.   And how did you make the second payment, how physically?

10    A.   The same way because I live in New York so I have to wire

11    the money for her.

12    Q.   Do you -- roughly, approximately, do you remember how much

13    the second payment was?

14    A.   The second -- I'm not sure.

15    Q.   You said Mr. Phillippe asked you about an appeal.  Do you

16    remember that testimony?

17    A.   Yes.

18    Q.   When was the first time you spoke to Mr. Phillippe about

19    the appeal?

20    A.   That was in the beginning -- before the sentence.

21    Q.   What date approximately?

22    A.   I don't remember the date because we spoke all the time.

23    Q.   How do you know it was before the sentencing and not after,

24    if you don't remember the date?

25    A.   We spoke all the time because the appeal was supposed to be
```

1    done before the sentence.  The day before the sentence we spoke

2    to, the same thing for the appeal.

3    Q.   How do you know it was supposed to be done before the

4    sentence?

5    A.   Because he tells me.

6    Q.   In terms of these conversations about an appeal, did you

7    have these conversations with anyone other than Mr. Phillippe?

8    A.   Yes, I had a conversation with his wife, his brother, so it

9    was about the appeal.

10   Q.   What exactly was your understanding what needed to be

11   appealed?

12   A.   My understanding of the appeal, so he is going to appeal

13   the case because he is going to plead not guilty.

14   Q.   Could you explain that again?

15   A.   So, he is going to plead not guilty.  So what that means is

16   he is going to appeal the case because they say he have like

17   three time before he can do the appeal.

18   Q.   Do you understand that Mr. Phillippe has plead guilty in

19   this case?

20   A.   If he plead guilty?

21   Q.   No, do you understand that he has, in fact, plead guilt in

22   this case to money laundering charges?

23   A.   That's what I hear.

24   Q.   Okay.  That's what you hear or that's what you understand?

25   A.   That's what I understand, yes.

```
 1    Q.   Because you said that he wanted to appeal because he had

 2    plead not guilty?

 3    A.   That's what he is going to do.

 4    Q.   I am not following.

 5         He already plead guilty, sir.

 6    A.   No, I am talking about before.

 7    Q.   One second.  Sir, if I can go back to your, you said you

 8    spoke to Zeljka on two occasions; the first on June 6th, 2017,

 9    and the second on June 8th, 2017.  Do you recall that

10    testimony?

11    A.   Yes, I think the first one was June 6th and the second one

12    was June 8th.

13    Q.   When was the first time that Zeljka told you personally,

14    sir, that you needed to hire an appellate lawyer for

15    Mr. Phillippe?

16    A.   On my second call.

17    Q.   So that would have been approximately June 8th, 2017?

18    A.   Yeah.

19    Q.   Based on your testimony, you have been having conversations

20    with Mr. Phillippe since before his sentencing about the

21    appeal.  Is that correct?

22    A.   Say that again.

23    Q.   Based on your testimony here today, you indicated that you

24    had been discussing with Mr. Phillippe the appellate issue

25    since before the sentencing?
```

```
 1   A.   Not before -- I am talking about after, once she told me

 2   that we got to get another lawyer for the appeal so I discussed

 3   that for him.  So that was the time that you talk about it

 4   because she is supposed to done the appeal before.

 5   Q.   Oh, I believe now I understand.

 6        So the first time you spoke to Mr. Phillippe about the

 7   appeal was when Zeljka told you on June 8th, 2017, that no

 8   appeal had been filed?

 9   A.   Yeah.

10   Q.   So prior to June 8th, 2017, you hadn't spoken to

11   Mr. Phillippe about the appeal?

12   A.   My understanding, he know the appeal is going to be done

13   because they never told him the appeal not filed.

14   Q.   I appreciate what your understanding is, sir, but I am

15   asking you, specifically, you, Mr. Maxi, when was the first

16   time you discussed the appellate issue with Mr. Phillippe?

17   A.   That's after I spoke to Zeljka.  She told me I had to get

18   another lawyer for the appeal.  That's the time when I called

19   him.  I told him, yo, she told me you got to get a lawyer for

20   the appeal.

21   Q.   Understood.  So one last time, just for clarity of the

22   record.  The first time you personally spoke to Mr. Phillippe

23   about the appellate issue was --

24   A.   No, not the first time we spoke to her.  We spoke because

25   he know the appeal was filed.
```

```
1    Q.   Okay.  I am asking you personally --

2    A.   Okay.

3    Q.   You know how you and I are talking now?

4    A.   Okay.

5    Q.   My question is whether in person or by telephone, when was

6    the first time that you spoke to Mr. Phillippe about the

7    appellate issue?

8    A.   That was after the sentence.

9    Q.   After the sentence?

10   A.   Yes.

11   Q.   Do you recall the date of the sentencing?

12   A.   No.

13        MR. CAMACHO:  Thank you, Your Honor.  I have no further

14   questions for the witness.

15        MR. PITZER:  Nothing further from the witness, Your

16   Honor.  Thank you.

17        THE COURT:  You may step down.  Thank you, sir.

18        Is he finished as a witness?

19        Can he stay in the courtroom?

20        MR. CAMACHO:  No objection to him staying in the

21   courtroom should he desire.

22        (The witness, Natalie Phillippe, was duly sworn.)

23        COURTROOM DEPUTY:  Please take a seat.

24        THE COURT:  One second, please.

25        Sir, if that gentleman wants to stay in the courtroom
```

 1   that just testified, tell him he can do so.  I know he traveled

 2   here from New York.

 3            MR. PITZER:  Thank you, Your Honor.

 4            COURTROOM DEPUTY:  Please state your name and spell

 5   your last name for the record.

 6            THE WITNESS:  Natalie Marie Phillippe.

 7                      DIRECT EXAMINATION

 8   BY MR. PITZER:

 9   Q.  Where do you live, Natalie?

10   A.  Milwaukee, Wisconsin.

11   Q.  You are the wife of Guy Phillippe.  Is that right?

12   A.  Yes, I am.

13   Q.  How long have you been married?

14   A.  Over 21 years.

15   Q.  Twenty-one years.

16       I would like to ask you when you became aware of Guy's most

17   recent problem with the criminal justice system?

18   A.  It was in January, right after it happened, 2017.

19   Q.  How did you become aware?

20   A.  My son called me from Haiti.  He was in Haiti and he told

21   me what had happened.

22   Q.  All right.  Were you involved in Guy's case in any way?

23   A.  Yes, I was.

24   Q.  Tell the Court, if you would, what your involvement was.

25   A.  When I understood that Guy was brought to Miami and would

```
 1   be appearing before a judge, I did not want him to appear by

 2   himself without counsel, so I was communicated the name of

 3   Zeljka Bozanic and I called her.  And I asked if she would

 4   appear with him before the judge on that morning.

 5   Q.   And how did she respond?

 6   A.   She agreed and she did appear.

 7   Q.   Did you have any discussions with Ms. Bozanic about

 8   retaining her as counsel?

 9   A.   I did.

10   Q.   Can you summarize those discussions, please?

11   A.   We discussed -- after she had spoken to Guy more, she

12   wanted to know about more about the case.  We discussed the

13   options, possibilities of what could happen and a fee.

14   Q.   Do you recall at all what she told you about options?

15   A.   When she talked about the three different motions that

16   would be presented, she said that they could be appealed and

17   later like if it went to trial or if he would do a plea.

18   Q.   All right.  So, after -- would it be fair to say after

19   evaluating the case she communicated to you that she thought it

20   would be appropriate to file three pretrial motions?

21   A.   Yes.

22   Q.   Do you know if, in fact, those were prepared and filed?

23   A.   Yes.

24   Q.   Do you happen to know whether or not it was Ms. Bozanic who

25   prepared and filed those?
```

1    A.   She did.

2    Q.   All right.  And you've also indicated, I think, that there

3    was a fee agreement.  Correct?

4    A.   Verbal.

5    Q.   What was the verbal fee agreement as well, if you recall?

6    A.   Fifty thousand dollars.

7    Q.   And was there any discussion about that being a flat fee or

8    something of that nature?

9    A.   Yes, there was a flat fee.

10   Q.   A $50,000 flat fee?

11   A.   Yes.

12   Q.   Did you undertake to pay that fee?

13   A.   I made an initial payment but it was -- I no longer was

14   able to, so another friend of Guy's and his family took that

15   over.

16   Q.   All right.  You followed the progress of the case, did you

17   not?

18   A.   I did.

19   Q.   What did you come to learn about the three pretrial motions

20   that had been filed?

21   A.   They were denied by the judge.

22   Q.   Do you know what Guy wanted to do, if anything, at that

23   point?

24   A.   Oh, it was definitely clear he wanted to appeal.

25   Q.   Do you know whether or not that was communicated to

```
1   Ms. Bozanic?

2   A.   Several times.

3   Q.   At some point did another lawyer become involved in the

4   case?

5   A.   Yes, Alan Ross.

6   Q.   And do you happen to know how Alan Ross came to be involved

7   in the case after Ms. Bozanic was counsel?

8   A.   Ms. Bozanic told me that she was not able to do the case by

9   herself in its entirety and she wanted someone else with more

10  experience.

11  Q.   Did she mention the name Alan Ross?

12  A.   Yes.

13  Q.   And did you ever speak to Mr. Ross?

14  A.   I did.

15  Q.   Will you tell the Court what your conversation was with

16  Mr. Ross?

17  A.   We spoke regarding the following actions that he would take

18  for Guy's case.  We talked about a fee and just various

19  options.

20  Q.   Just to be clear, did Mr. Ross enter the case before or

21  after the pretrial motions had been prepared?

22  A.   He entered after they were submitted.

23  Q.   All right.  After.  And after they had been ruled on?

24  A.   I, unfortunately, don't know the exact time line on that.

25  Q.   But they had been filed prior to his entry in this case?
```

1   A.   Officially, yes.   Yes.

2   Q.   Okay.   You just said "officially."

3        Do you have reason to believe that Mr. Ross was

4   unofficially involved in the case prior to the filing of

5   pretrial motion?

6   A.   Yes.   I spoke to him before the pretrial motions were

7   prepared and submitted, and he told me that even though he was

8   not attorney of record, he was working with Ms. Bozanic on

9   those.

10  Q.   Okay.   And then subsequently those motions were, in fact,

11  overruled.   Correct?

12  A.   Correct.

13  Q.   And did you have any conversations with your husband about

14  how he wanted to proceed after those motions had been

15  overruled?

16  A.   Yes, most definitely.   Right after we found out they were

17  overruled, he wanted to appeal all three of them.

18  Q.   And do you know whether or not he made that known to both

19  of his lawyers, Ms. Bozanic and Mr. Ross?

20  A.   Yes, he had spoken -- well, he e-mailed me, phoned me and I

21  relayed those messages to both Ms. Bozanic and Mr. Ross.

22  Q.   Did either one or both respond to you in terms of your

23  request?

24  A.   Yes.

25  Q.   And did they acknowledge that they were going to appeal or

1  how did they respond?

2  A.   They said that they were going to visit Guy the next day or

3  two and talk about how they would proceed with the appeals.

4  Q.   All right.  Fine.

5       Did you have any further discussions with those lawyers,

6  particularly pertaining to Guy's decision to enter a negotiated

7  plea?

8  A.   Yes.

9  Q.   Do you recall the nature of those discussions?

10  A.   They just explained to me what the options, like the

11  procedures for a plea, the different negotiations that were

12  happening and then I need -- some -- they reviewed some of the

13  conversations with Guy.

14  Q.   Okay.  Do you recall either of the lawyers indicating to

15  you that if Guy decided to enter this plea that that would be

16  the end of his appeal?

17  A.   No.

18  Q.   After your husband entered his plea and was sentenced, did

19  you then communicate with him again about his case?

20  A.   Yes, he asked about the appeal.

21  Q.   All right.  Was that by way of a visit or a phone call or

22  how was that inquiry made?

23  A.   After the plea it was by phone.

24  Q.   And please relate the nature of that, and substance of that

25  conversation, if you would.

1    A.   When he found out that the appeal wasn't made?

2    Q.   Yes, ma'am.

3    A.   He was angry, pissed.  He was under the understanding that

4    an appeal had been made, and he was devastated because he

5    understood that he was misinformed, that his lawyers didn't do

6    what he understood they had done or was supposed to do.

7    Q.   Do you know whether or not your husband or anyone on his

8    behalf contacted Ms. Bozanic or Mr. Ross after your husband

9    became aware that the appeal had not been filed as he thought

10   it had been to inquire of him what had happened?

11   A.   No.

12   Q.   No to?

13   A.   I don't believe that he had contacted them.  That I don't

14   know.

15   Q.   Is there some reason why Guy wouldn't have contacted the

16   two lawyers that he had paid and who told him that they -- at

17   least according to his statements to you, had told him they

18   were going to file the appeal and didn't?  Do you have any

19   reason why they didn't contact him?

20   A.   He has the personality that when someone does not do what

21   they are supposed to do, what they are being paid to do, what

22   he has asked them to do, he is finished with them.  He won't

23   tolerate it.  He is just down.

24   Q.   Do you know what steps Guy took after he became aware that

25   an appeal hadn't been filed to try to deal with that situation?

1    A.   Yes, he contacted another lawyer.

2    Q.   Do you happen to know who that other lawyer was?

3    A.   Mr. O'Brien from his cabinet in Tampa.

4         MR. PITZER:  That's all I have for the witness, Your

5    Honor.

6         THE COURT:  Okay.  Cross, please.

7                        CROSS-EXAMINATION

8    BY MR. CAMACHO:

9    Q.   Good morning, Ms. Phillippe.

10        You indicated you have been married to Mr. Guy Phillippe

11   for 21 years?

12   A.   Yes.

13   Q.   And I believe I read this somewhere but you met him while

14   you were on a project in Ecuador?

15   A.   I was studying abroad.

16   Q.   So that's when the courtship started many years ago?

17   A.   Yes.

18   Q.   How many years ago was that, approximately?

19   A.   It will be 24 years next month.

20   Q.   Are you originally from Wisconsin?

21   A.   Yes.

22   Q.   So it must have been quite a romance or courtship for a

23   young lady from Wisconsin to fall in love with a young man from

24   Haiti at that time?

25   A.   I guess.

```
 1          THE COURT:  What's the relevancy?  Get to your
 2   questions.
 3          I don't understand the relevance of you asking about
 4   their relationship.
 5          MR. CAMACHO:  Your Honor, I am going no into motivation
 6   for her testimony here today.
 7   BY MR. CAMACHO:
 8   Q.  So I would assume that it was a difficult relationship,
 9   coordinating logistics, maybe family challenges?
10   A.  I think every relationship has difficulties.
11   Q.  But, yet, despite all that you were persistent in the
12   relationship, I would assume?
13   A.  What do you mean by persistent?
14   Q.  You are still married.  Is that right?
15   A.  Yes.
16   Q.  And you continue communicating?
17   A.  Yes.
18   Q.  And you made efforts to maintain the relationship, the
19   marriage?
20   A.  Yes.
21   Q.  And I would imagine that Mr. Phillippe has done the same.
22   Right?
23   A.  Yes.
24   Q.  Do you know Mr. Phillippe to be a very determined man?
25   A.  Yes.
```

```
 1   Q.   Early on in his career he started out as a Haitian national
 2   police.  Is that correct?
 3   A.   Yes.
 4   Q.   And eventually he was involved in a revolution in Haiti?
 5   A.   Yes.
 6   Q.   He was expelled from Haiti and he left to Ecuador, I
 7   believe?
 8   A.   Yes.
 9   Q.   Then he came back to Haiti?
10   A.   Correct.
11   Q.   And then he was stationed in the Dominican Republic for a
12   time period?
13   A.   No.
14   Q.   Was he in the Dominican Republic at any point in time?
15   A.   Yes.
16   Q.   And he was persistent in his cause.  Right?
17   A.   What cause is that?
18   Q.   The cause to overthrow the Aristide government?
19   A.   He was persistent in the -- in making his country better
20   for everyone.
21   Q.   Right.  And that takes real determination because this
22   didn't happen overnight.  Is that correct?
23   A.   Correct.
24   Q.   So you would agree with me that he is an incredibly
25   persistent and determined individual?
```

```
 1    A.   Yes.

 2    Q.   And someone you love very much?

 3    A.   Yes.

 4    Q.   I want to cover that you indicated that -- I had when here

 5    in my note.  Just one second.

 6         You said that Guy Phillippe, your husband, asked you about

 7    an appeal by phone after the plea.

 8         Do you recall approximately when that was?

 9    A.   I do not, no.

10    Q.   Do you know when the change of plea occurred?

11    A.   The change of plea?

12    Q.   Yes, when he entered a guilty plea?

13    A.   June, I believe.  June, July, that summer, last summer.

14    Q.   And do you recall the conversation about the potential

15    appeal, do you recall if that was after sentencing?

16    A.   We were talking about appeals since the judge denied the

17    first three motions.  That's when the first conversation

18    started about an appeal.

19    Q.   Were you ever present for any conversations between

20    Mr. Phillippe and Ms. Bozanic personally there observing the

21    conversation?

22    A.   At one time.

23    Q.   When was that?

24    A.   In January right after he was brought here to the United

25    States.
```

```
 1   Q.   Were you part of any other conversations personally present
 2   where you observed any conversation between Ms. Bozanic and
 3   Mr. Phillippe?
 4   A.   No, I was not.
 5   Q.   Were you present for any conversations in which
 6   Mr. Phillippe had with Mr. Ross?
 7   A.   No, I was not.
 8   Q.   So any knowledge you have about the appellate issue, so to
 9   speak, you have acquired from Mr. Phillippe directly?
10   A.   I also spoke with Alan Ross and Ms. Bozanic, regarding the
11   appeals.
12   Q.   Let's walk through that timeline.  How many times did you
13   speak with Ms. Bozanic about the appellate issues?
14   A.   I can't even begin.  All I know is every time Guy would
15   send me an e-mail or he would call me I would relay that
16   message to Ms. Bozanic either by phone or by WhatsApp.
17   Q.   And what was the last -- when was the last time you have
18   communicated any message regarding appellate issue to
19   Ms. Bozanic?
20   A.   That I cannot remember.
21   Q.   You indicated when Mr. Phillippe is done with someone, when
22   he doesn't do their job, he cuts them off.  Is that correct?
23   A.   Uh-huh.
24   Q.   Which is different from a determined man.  Would you agree?
25            MR. PITZER:  Objection.
```

```
1              THE COURT:  Sustained.

2   BY MR. CAMACHO:

3   Q.  When was it, approximately, that Mr. Phillippe communicated

4   to you directly that he is done with Ms. Bozanic, no contact

5   with her, no talking about it, he is done with her?

6   A.  I don't recall a direct conversation regarding I am done

7   with her but when he started -- when he asked to get another

8   lawyer then that's where.

9   Q.  Could you help me putting a time line with this?

10       You made a very general statement or very specific

11   statement that when Mr. Phillippe is done with someone, he is

12   done with someone, and I want to get a sense of when that date

13   would be, in your head.

14   A.  After he found out that the appeal was not made after his

15   plea.

16   Q.  So your best estimation, based on your direct knowledge of

17   speaking to Mr. Phillippe, this would have occurred after the

18   plea?

19   A.  Correct.

20   Q.  So he was done with her after the plea based on your best

21   estimation?

22   A.  My best estimation, yes.

23              MR. CAMACHO:  Just one second, Your Honor.  I am going

24   to review my notes.

25              No further questions, Your Honor.
```

```
 1                THE COURT:  All right.

 2                MR. CAMACHO:  Just one thing, briefly, Your Honor.

 3                          REDIRECT EXAMINATION

 4    BY MR. PITZER:

 5    Q.   In terms of the chronology of Guy's case, you were aware,

 6    were you not, that he had decided to enter a plea?

 7    A.   Yes, I was.

 8    Q.   Did you, at any time, see the plea agreement?

 9    A.   No.

10    Q.   All right.  Did Guy ever discuss with you the terms of the

11    plea agreement?

12    A.   No.

13    Q.   I think you indicated that the concern or -- I'm sorry.

14    That when Guy decided to cut relations with Ms. Bozanic and

15    Mr. Ross was after the plea.

16         Do you understand that after the plea there was a

17    sentencing phase of the case?

18    A.   Now that you say that, yes.

19    Q.   And they were still -- that is Ms. Bozanic and Mr. Ross

20    were still involved at the sentencing phase of the case.

21    Correct?

22    A.   Yes, they were.  So, no, to me it's all jumbled together.

23    Q.   That's what I thought.

24    A.   Yes.

25                MR. PITZER:  Okay.  Thank you.
```

```
1             THE COURT:  Anything else for the Government?

2             MR. CAMACHO:  No, Your Honor, thank you.

3             THE COURT:  Thanks.  You may step down.

4         Thank you.

5             MR. PITZER:  Your Honor, if Ms. Bozanic is present, I

6     would like to call her now.  If not, I will proceed with

7     another witness.

8             THE COURT:  No.

9             MR. PITZER:  In that event, Your Honor, we will call

10    Guy Phillippe.

11            THE COURT:  Okay.  Sir, take the a shackles off,

12    please.

13        Sir, please.

14            COURTROOM DEPUTY:  Sir, please raise your right hand.

15            (The defendant, Guy Phillippe, was duly sworn.)

16            COURTROOM DEPUTY:  Please take a seat.

17        Please state your name for the record.

18            THE WITNESS:  Guy Phillippe.

19            COURTROOM DEPUTY:  Thank you.

20                          DIRECT EXAMINATION

21    BY MR. PITZER:

22    Q.  Mr. Phillippe, you are currently residing here in Miami in

23    the detention center.  Is that correct?

24    A.  Yes, exactly.

25    Q.  And you are a citizen of Haiti.  Is that correct?
```

1    A.   Yes.

2    Q.   You were born in Haiti?

3    A.   Yes.

4    Q.   And where were you educated?

5    A.   I was educated in Haiti, and then I went to the University

6    of Mexico and Ecuador.

7    Q.   And what did you study in the University of Mexico?

8    A.   In Mexico I studied with chemistry.  Then I changed my

9    mind.  I wanted to go to the military academy.

10         THE INTERPRETER:  One moment.  Move the microphone for

11   him, please.

12         Go ahead.

13         THE WITNESS:  I left the University of Mexico.  I went

14   to the Ecuador to the academy and then I studied law in the

15   academy.  That is mandatory in that academy.

16   BY MR. PITZER:

17   Q.   All right.  Then after your education in Mexico and

18   Ecuador, you returned to Haiti.  Is that correct?

19   A.   Yes.

20   Q.   What was your occupation after you returned to Haiti?

21   A.   First of all, I took care of the security detail of the

22   president and then I was a police chief in many different

23   communes or states in Haiti.  In 2000, I had to leave Haiti

24   because I had problems with President Aristide.

25   Q.   And prior to leaving Haiti and occupying these posts of

```
 1   security and law enforcement in Haiti, how old were you at that
 2   point in time?
 3   A.   27, 28, 29, I think it's about that time.
 4   Q.   And I think you just testified that you eventually left
 5   Haiti due to problems that you were having or differences that
 6   you had with the Aristide government.  Is that right?
 7   A.   Yes, that's correct.
 8   Q.   When was the time you left Haiti?
 9   A.   October 2000.
10   Q.   Did you participate in a coup d'etat relating to President
11   Aristide?
12   A.   The elections were done in 2001 in Haiti.  All the
13   international community, including the United States --
14        THE COURT REPORTER:  I'm sorry, I can't hear.
15   A.   All the international community, including the United
16   States, said that Aristide had taken power illegally and they
17   cut all relations with Haiti.  The country went into a
18   miserable phase.  The students took to the street asking for
19   the departure of the president.
20        All the parties, political parties, all the economic
21   sectors of the party participated.  As a former police chief
22   that being a big part of the police and also military
23   personnel, some people contacted me.  Among these were American
24   officials and Haitian officials in the past to help Haiti to
25   get out of where it was.  That's what I did in 2004.
```

1    So I removed Aristide, who was a dictator, and I helped my

2    country -- I returned power to the civilian authorities without

3    keeping it for myself.

4    Q.   In the course of doing that, did you have a formal

5    structured organization of any type?

6         MS. KIRKPATRICK:  Your Honor, I am going to object to

7    this line of questioning.  I am not sure how it's relevant to

8    the issue at hand.

9         THE COURT:  Well, I believe your co-counsel brought

10   this issue up, so overruled.  Ask your question.

11        MR. PITZER:  Will you re-ask your question, please?

12   You want me to do it?

13        THE INTERPRETER:  Yes.

14   BY MR. PITZER:

15   Q.   My question was, in the course of doing what you did, did

16   you have any type of a formal organization with a name, with a

17   structure, anything like that?

18   A.   I didn't have a formal organization when we started because

19   we started in 2000, but in 2004, yes, a political party was

20   formed and I was head of that political party.

21   Q.   And what political party was it that you were a head of in

22   2004?

23   A.   I am the Secretary General of FLN, still now FLN.  I am the

24   Secretary General of FLN.

25   Q.   Was then and still is?

1    A.   And still now, yes.  Until now.

2    Q.   What do those initials stand for?

3    A.   National Reconstruction Front.

4    Q.   Thank you.

5         Did you actually, with your organization or your followers,

6    capture the presidential palace in Haiti?

7    A.   In Santo Domingo, everyone was present; the representatives

8    of the political parties in Haiti, people that said they came

9    from the American Embassy as well, and I promised that after

10   the military movement I would not hold on to power.  And I said

11   this to CNN when I spoke there live.  I said I would not hold

12   on to power because I promised that I would respect my

13   engagements.

14   Q.   Have you ever -- was he finished?

15        Have you ever sought elective office in Haiti?

16   A.   Yes.  In 2006, I went to -- I lost to Rene Preval, but I

17   was a candidate in the election.  In 2015, I was a senatorial

18   candidate, as a senator, and I am still today a senator

19   having -- holding function in Haiti.

20   Q.   All right.  So you were elected a senator in Haiti and you

21   still are.  Is that correct?

22   A.   Until 2022.

23   Q.   You will be a senator in Haiti until 2022?

24   A.   According to Article 95 of the Constitution, yes.

25   Q.   All right.  What was the date that you were arrested?

1   A.   January 5th.

2   Q.   Of what year?

3   A.   2017.

4   Q.   Where were you arrested?

5   A.   I was arrested as I was shaking hands with people in the

6   street.

7   Q.   And by whom were you arrested?

8   A.   At the beginning I didn't understand who was arresting me

9   because there was a lot of gunshots.   There were people who got

10   actually shot and some of my security detail was shot as well.

11        MS. KIRKPATRICK:   Your Honor, I am going to again

12   object to relevance.   This is beyond anything that co-counsel

13   brought up.

14        THE COURT:   Counsel, I am going to sustain that

15   objection.

16        MR. PITZER:   Very well, Judge.

17   BY MR. PITZER:

18   Q.   Let's direct your attention to when you arrived in the

19   United States to answer the indictment.   Fair enough?

20   A.   Okay.

21   Q.   Did you or did someone on your behalf engage counsel for

22   you, hire a lawyer?

23   A.   When they arrested me in Haiti, they took me to a private

24   home that was four Americans.

25   Q.   No, we are talking about when you got back to the United

1    States.

2    A.   That's what I am explaining, though.  That's what I am

3    explaining.  From the American home they took me and they put

4    me on an airplane.  And from there I was -- all my movements

5    were restricted, so I was not able to contact anyone.

6    Q.   Okay.  Did somebody ultimately, on your behalf, contact a

7    lawyer for you?

8    A.   No, I don't think that even my family members knew where I

9    was.  That's how I came to see that Zeljka came and she said

10   that a friend of mine sent her to represent me.

11   Q.   So a friend of yours sent Zeljka Bozanic to represent you.

12        Is that correct?

13   A.   That's what she said, but I didn't have any telephone to be

14   able to call to verify whether that was true or not, and I

15   didn't have a choice either because I had no means of

16   communicating to anyone whatsoever.

17   Q.   When, roughly, did you first met Zeljka Bozanic?

18        THE COURT:  Translator, you will have to speak up a

19   little.

20   A.   The first time I went to court she was there.

21        THE COURT:  Okay.  Counsel, I need you to slow down

22   just a little bit so we can get the translation.

23        MR. PITZER:  I will, certainly, Your Honor.

24   BY MR. PITZER:

25   Q.   Did you meet with Ms. Bozanic after your initial court

1    appearance?

2    A.   Yes.   I would meet with her occasionally.

3    Q.   Okay.   Did you have any conversation with her about the

4    terms of her employment?   In other words, did you talk to her

5    about the fee, what she was going to be paid?

6    A.   I never really spoke about the fee with Zeljka.

7    Q.   In the course of the meetings with Zeljka, did she or did

8    she not make any recommendations to you about pretrial motions

9    that might be appropriate?

10   A.   Since the first day I met with Zeljka we were speaking.   I

11   explained to her clearly that what was done was illegal and it

12   was politically motivated.   It wasn't a question of just a

13   legal issue that was being defended, so I told her that we

14   needed to present is illegal and constitutional --

15           THE COURT:   Slow down.   You got to slow down.

16   A.   -- so that we could present these legal issues to the

17   American justice system.

18   BY MR. PITZER:

19   Q.   All right.   So you, at least from your perspective, told

20   your lawyer what you thought had been done improperly, in terms

21   of your arrest?

22   A.   Yes, I said that.   She said that it was a political case

23   and didn't see what it had to do with this.

24   Q.   Did Ms. Bozanic eventually prepare pretrial motions and

25   file them on your behalf?

1    A.   Two or three days after I met her in the second week of

2    January, we started working together and she told me that there

3    were three possibilities to win the case.  First of all, it

4    would be to show that they had no jurisdiction to do what they

5    did.

6         Second, as an elected senator of my country, the law, the

7    constitution says that I am not -- I am immune from arrest.

8         Thirdly, the statute of limitations and speedy trial

9    rights -- and the statute of limitations and my right to a

10   speedy trial would have been infringed.  And the case was so

11   messed up that even the Americans said that they arrested me in

12   Miami when, in fact, they arrested me in Haiti.

13        That's the report they gave to the Court but, in fact, it's

14   in Haiti that I was arrested by Agent Amos.  They said that it

15   was the Agent Amos that arrested me here but, in fact, they had

16   arrested me in Haiti.

17   Q.   Prior to those three pretrial motions that you just

18   mentioned had been filed, did you have the occasion to review

19   the content of those?

20   A.   Zeljka just said that she was doing motions but I never had

21   the motions.  She said she was going to -- I was the one that

22   told her first I need a lawyer that handles constitutional law

23   but she said that she has people that are even better and she

24   recommended Alan Ross.

25        She said that one would be in pretrial motions, the

1    district courts won't accept them but I would have to appeal.

2    And she would need Alan Ross, who is a specialist of appeals,

3    but before Alan Ross comes I had to give her -- she said I had

4    to give her 100,000 USD for Alan Ross, and that's what my wife

5    did.  We had to mortgage our house in order to do this to give

6    him $100,000.

7    Q.   Do you know whether or not Alan Ross participated in the

8    participation -- I'm sorry, yeah, on the preparation of the

9    three pretrial motions?

10   A.   Zeljka said yes, Alan Ross took it, but Alan Ross said

11   that -- she said Alan Ross said he would help her but he will

12   not sign off on these until the $100,000 is in his hands.

13   Q.   Mr. Ross did ultimately enter an appearance in the case.

14   Correct?

15   A.   Yes.  After they did not accept my motions, then they said

16   we have 14 or 15 days to appeal, and Alan Ross came and I think

17   the appeal was done because in the first motions, even though I

18   had given 25 exhibits, he only presented five of this, which

19   means that the judge was denied because there wasn't sufficient

20   supporting evidence to jack them up.  However, Zeljka said that

21   she needed more evidence before the date would expire.

22        MS. KIRKPATRICK:  Your Honor, if I may, I am going to

23   object.  We are getting into Counts 2 and 3 of the plaintiff's

24   petition, which the Court specifically ruled were not going to

25   be subject of this hearing.

```
 1              THE COURT:  Sustained.

 2              MR. PITZER:  Thank you.

 3    BY MR. PITZER:

 4    Q.   Thank you, Your Honor.

 5         After the three pretrial motions were denied, what, if any,

 6    communications did you have with your two lawyers about

 7    appealing the denial of those motions?

 8              THE COURT REPORTER:  I'm sorry.  I'm sorry.  You need

 9    to make sure when you're interpreting you have the little mic

10    on, because when he's talking, since I'm right next to him, I

11    can't hear you at all because I'm hearing him.

12              THE INTERPRETER:  I'm sorry, I can't hear what you've

13    said.

14              THE COURT REPORTER:  That's what's happening with me.

15         When you are answering, make sure you click the little

16    button because since he continues talking, I am having a really

17    hard time and I don't know if I'm getting your complete answer

18    because he continues talking.

19              THE INTERPRETER:  Oh, yes.  Yes.  You can hear me now?

20              THE COURT REPORTER:  Yes, I can hear.  Can you repeat,

21    just in case?

22    A.   Immediately after they denied the motion, I met many times

23    with Zeljka and Alan Ross and I needed a -- they asked me for

24    another piece of paper which the Haitian senate had voted on.

25    It was a resolution that was voted on by the Haitian senate of
```

```
1    March 17th.  I knew I had a lot of pressure with the time

2    deadline, so I asked a cousin to fly to Haiti, pay for his

3    ticket to fly to Haiti to get the paper and return it and bring

4    it to Zeljka.  Zeljka had to act before the time limit before

5    the end of March.

6    Q.  I am going to ask my question one more time.

7        After the pretrial motions were denied, did you talk to

8    your lawyers about appealing the denial of your motions and, if

9    so, when?

10   A.  Each time I spoke to them, I always spoke to them about

11   appeal.  And I sent more than 20 messages to my brother, to my

12   wife, to Zeljka to tell them that the appeal must be done and

13   must be done on time.

14   Q.  Now, you say that the appeal must be done on time.  What

15   was your understanding as to the timeliness of the appeal, when

16   it had to be filed?

17   A.  I thought it would have been done before the 1st or 2nd of

18   April because they denied the motion about the 15th or the 17th

19   of March.

20   Q.  So what, if any, understanding did you have about how many

21   days the appeal needed to be filed with him to be timely?

22   A.  From what Zeljka said, it was about 14 days.

23   Q.  Did Zeljka or Alan at any time indicate to you that they

24   were going to file the appeal?

25   A.  They always -- they always told me that not to worry about
```

```
 1   it that they would file the appeal, and in addition, Alan Ross
 2   told me that he might need an extra $10,000 to pay for
 3   paralegal to do research.  And I had told him no problem, I
 4   would pay it.
 5   Q.  After your conversations about the overruling of your
 6   pretrial motions, as the case progressed, you ultimately
 7   decided to enter a plea.  Is that correct?
 8   A.  My attorneys had recommended that I took a plea about two
 9   weeks into the discussions, that I took a plea because from
10   what they understood it would be very difficult for me to fight
11   against the money laundering aspect of the accusations.
12       When I questioned that decision, they told me that there
13   were deposits that were made around the year 1999 and I wanted
14   more information in that because I told them to go to Wachovia
15   Bank to get further information because that's where my account
16   was.  Zeljka informed me that the bank would no longer have any
17   information.  They have no more files, no more information on
18   my files after seven years.
19           THE COURT:  Okay.  What's your next question?
20   BY MR. PITZER:
21   Q.  You did ultimately strike a plea agreement.  Correct?
22   A.  I have no choice because Zeljka told me that there was no
23   way I could fight or defend myself against those accusations
24   because the jury would be comprised of about 12 white
25   individuals.
```

1    Q.   Do you recall appearing before the Court at a hearing to

2    change your plea?

3    A.   Yes.

4    Q.   Do you recall prior to that your lawyers reviewing the plea

5    agreement that you had agreed to sign?

6    A.   Yes.

7    Q.   When you -- when your lawyers reviewed the plea agreement

8    with you, did they make you aware that by signing this plea

9    agreement and entering this plea that you would be waiving your

10   right to appeal your pretrial motions?

11   A.   They did not discuss the pretrial motions at that juncture

12   because in my opinion, once they were discussing the plea

13   agreement, the pretrial motions, the plea -- the appeal had

14   already been filed.

15   Q.   Do you remember appearing for the Court and the Court

16   taking you through the content of your plea agreement?

17   A.   I do recall.

18   Q.   And do you recall in any of the language that the Court

19   reviewed with you that would indicate again that you were

20   waiving your right to appeal your pretrial motions?

21   A.   Zeljka told me according to her the only part that I would

22   not be able to appeal was the sentencing phase.  That was my

23   understanding.

24   Q.   When do you recall first learning that neither of your

25   lawyers had, in fact, filed an appeal of your pretrial motions?

```
1    A.   In the beginning of July while I was having a conversation

2    with a cell mate.  I was discussing the fact that I had an

3    appeal in progress and I would probably go home in the near

4    future.  He told me that he was not sure, that I was just

5    sentenced on June 21st -- that he wasn't sure that I would get

6    an information on that appeal.  In fact, I was supposed to get

7    a response on the appeal that was filed since April.

8         Upon further discussion, he informed me that he had a good

9    attorney that he would put me in touch with because he was of

10   the impression that my present attorneys were in the process of

11   stealing me blind, robbing me blind.

12   Q.   And did you or someone on your behalf contact another

13   attorney?

14   A.   I contacted my wife.  I contacted my brother as well as

15   Junior.  I gave them the telephone number to contact the

16   attorney and I told them to get in touch with that attorney so

17   that they could find out what's going on.

18   Q.   And that attorney was Mark O'Brien, the attorney who has

19   appeared and testified today?

20   A.   That's the one.  He is the one that I spoke with.

21   Q.   And did you find Mr. O'Brien's testimony today to be

22   totally accurate?

23   A.   I did not have a lot of conversations with him.  We only

24   spoke that one time and I told him the fact of the case at that

25   time.
```

1    Q.   Do you recall meeting with the other lawyer who testified

2    here today, Rachel Reese?

3    A.   We had several conversations over the telephone, she and I.

4    However, I was unable to meet her in person because they

5    shipped me out to a different prison on August 10th and I did

6    not have access to a telephone because on September 1st I was

7    placed in isolation in the SHU and I had no access to a

8    telephone for two months.

9    Q.   Did Rachel Reese eventually tell you that she had looked

10   into your appeal and that an appeal had never been filed?

11   A.   I finally had the opportunity to speak with her in January

12   since I spoke with her the first time in September.  She

13   thought that she was of the opinion that I had to file a 2255,

14   so I said okay.  By that time, I had a friend in the jail that

15   was in the process of helping me to file a pro se which I had

16   already done.

17   Q.   I have to ask again, did Rachel Reese tell you that as a

18   result in her looking into your case that no appeal of your

19   pretrial motions had been filed as you thought it had been?

20   A.   That is what she said.  She told me that my attorneys did

21   not proceed with that.

22   Q.   How did you reply to that information?

23   A.   Well, since I had that conversation with my friend who is

24   also in jail, my cell mate, I came to realize that my two

25   attorneys on file were working for both sides.  So I took the

1   decision right then and there that I would proceed on my own,

2   do things pro se.

3   Q.   So when you said you came to the conclusion that your

4   attorneys were working on both sides, is that why you didn't

5   call either one of them after the fact?

6   A.   After my sentencing hearing of June 21st, I spoke with

7   Zeljka once.  She went to visit me one more time.  I sent her

8   an e-mail stating that I received information from various

9   people who told me that she spoke very well on television and I

10  thanked her for the interview, and that was the last time we

11  spoke, she and I.

12  Q.   Again, I am going to ask the question again.  You testified

13  that you were of the opinion, ultimately, that your lawyers

14  were working for both sides.  Is that the reason you didn't

15  call them and specifically ask them what had happened with the

16  appeal that you thought had been filed?

17  A.   Once the cell mate told me -- well, my attorney did not

18  contact me.  I had no response.  I thought they were just

19  playing with me, so I decided to use a different attorney.

20          MR. PITZER:  All right.  That's all I have today, Your

21  Honor.

22          THE COURT:  The last question you asked, when did that

23  take place, that you described about talking to the friends in

24  jail?

25          MR. PITZER:  Could you hear the Court's question,

```
1    please?

2           THE WITNESS:  I believe that occurred during the second

3    week of July.

4           THE COURT:  Okay.  Thank you.

5           MR. PITZER:  Thank you, Your Honor.

6           MS. KIRKPATRICK:  Your Honor, my apologies.  I didn't

7    hear the Court's last question.  I heard the answer.

8           THE COURT:  I was asking him when that conversation

9    took place.  He said the 2nd of July.

10          MS. KIRKPATRICK:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12   BY MS. KIRKPATRICK:

13   Q.   Good morning, Mr. Phillippe.  You testified you studied in

14   three different places.  Correct?

15   A.   Yes.

16   Q.   That was Haiti, Mexico and Ecuador.

17   A.   That's correct.

18   Q.   And you indicated that you had a military background and a

19   legal background because of that military background and police

20   background.

21        Correct?

22   A.   I was a cadet of the Haitian Military Force.  They are the

23   ones who sponsored me in front of the Ecuadorian government.  I

24   can say that I have the military background but although I went

25   back to Haiti the military was no longer functioning.
```

1    Q.   But you were an educated man.  Correct?

2    A.   It depends what you mean by being educated.

3    Q.   Well, you said that you studied both in Ecuador and Mexico

4    in addition to Haiti.  Correct?

5    A.   Yes, ma'am.

6    Q.   And you've been heavily covered in the press throughout

7    your life, have you not?

8    A.   Yes.

9    Q.   And you have given multiple interviews about your political

10   views and your actions as it related to Aristide.  Correct?

11   A.   Yes.

12   Q.   Taking you to your arrival to the United States and in

13   court, you indicated that you paid Ms. Zeljka Bozanic and

14   Mr. Alan Ross a significant amount of money.  Correct?

15   A.   What I said is that Zeljka required that we came up with

16   $100,000 so that Alan Ross would come on the case.

17   Q.   How much did you pay Ms. Bozanic?

18   A.   I did not hire her.  As we speak, I don't even know how she

19   became my attorney.

20   Q.   And you indicated that your wife mortgaged the house to pay

21   Mr. Ross?

22   A.   That's what I believe that my wife had said, but I know

23   that my wife is the one that make the deposits for Mr. Ross's

24   payment.

25   Q.   But you heard your wife testify that a friend paid for

```
 1   Ms. Bozanic's fee, did you not?
 2   A.   The $100,000 was strictly Mr. Bozanic's fees.  Ms. Bozanic
 3   had nothing to do.  She had no part of that.
 4   Q.   But Mr. Ross came in after Ms. Bozanic, did he not?
 5   A.   Yes, he did.
 6   Q.   And you testified that there were three motions that
 7   Ms. Bozanic was filing in court that were eventually denied?
 8   A.   Exactly.
 9   Q.   And you testified that you did not read those motions
10   before they were filed?
11   A.   No, I did not.  I later requested those motions but at the
12   time they were filed I did not have any information of the
13   context.
14   Q.   Were you able to access your court records from the jail?
15   A.   Because I did not have any friends and I was also placed in
16   isolation in the SHU, so I did not have any information.
17   Q.   You said you did not have any friends?
18   A.   In the beginning.  In the beginning prior to the motions
19   being filed I did not have any friends.
20   Q.   But you heard Mr. Maxi testify that he was speaking to you
21   throughout your incarceration, did you not?
22   A.   Maxi is a friend.  My wife and Maxi do not have any
23   information as to how the law operates, so I was not going to
24   depend on them for legal advice.
25   Q.   But you heard both of them testify that they followed your
```

1    case very closely.

2         Correct?

3    A.   I believe as my friend and as my wife, they were supposed

4    to do that.

5    Q.   Do you remember Mr. Ross or Ms. Bozanic mentioning an

6    attorney by the name of Waxman?

7    A.   No.

8    Q.   Do you remember having conversations about the

9    interlocutory appeal?  That's an appeal that would be taken

10   before trial, before you plead guilty, an immediate appeal.

11   A.   No, I don't recall that.

12   Q.   Okay.  But you ended up deciding that you wanted to plead

13   guilty.  Correct?

14   A.   My options at the time was either go to trial or plead

15   guilty.

16   Q.   And you testified in court that at your initial appearance

17   and at your arraignment that you had been given a copy of your

18   indictment.  Correct?

19   A.   I'm sorry?

20   Q.   Let me ask a different way.

21        You have seen the indictment against you.  Right?

22   A.   Yes, Zeljka at that time did show me the indictment.

23   Q.   Then you know that you were charged with drug trafficking

24   and money laundering.  Correct?

25   A.   It was conspiracy.

1   Q.   And you know that the conspiracy to traffic in drugs

2   carried a life sentence as the possible maximum.  Correct?

3   A.   Well, my problem is that I didn't really understand that

4   because based on my understanding of the law the concept of

5   conspiracy is not part of it.

6   Q.   What I am asking you, Mr. Phillippe, is you know that one

7   of the charges that was included in your indictment that you

8   were told at your initial appearance carried a life sentence as

9   the maximum sentence.  Is that correct?

10  A.   I believe that from the day we were, Zeljka and I were

11  discussing the plea negotiations, I thought I was facing a

12  certain amount of time for all three charges.

13       I did not understand that they were separated.

14  Q.   Okay.  But you did not plead to the conspiracy to traffic

15  drugs, did you?

16  A.   I pleaded for conspiracy to money laundering.

17  Q.   And that carried a 20-year maximum.  Correct?

18  A.   I really have not much understanding of how much I was

19  facing.  I really am not very well versed in that aspect of the

20  law.

21  Q.   Do you remember your change of plea?

22  A.   Yes.

23  Q.   It was on April 24th, 2017?

24  A.   Yes.

25  Q.   And it was in front of Judge Altonaga?

1    A.   Exactly.

2    Q.   And do you remember Judge Altonaga going through a bunch of

3    different rights that you had?

4    A.   I do.

5    Q.   And do you remember that Judge Altonaga told you that you

6    were going to be pleading guilty to a violation of Title 18,

7    United States Code, Section 1956(h)?

8    A.   I don't recall the exact details.

9    Q.   Do you remember that the Court said that in your plea

10   agreement that you testified you read before you signed that

11   the maximum possible sentence was 20 years imprisonment?

12   A.   I probably did, but I don't recall.

13   Q.   Do you remember that in that plea agreement the Court told

14   you that the Government had agreed to certain things?

15   A.   I'm sorry?

16   Q.   Do you remember -- well, first, let me go back.  Do you

17   remember telling the Court that you understood all of that that

18   she had told you?

19   A.   Yes.

20   Q.   And do you remember that the Court said that the Government

21   had agreed to limit your loss for the offense to between

22   1.5 million and 3.5 million?

23   A.   I believe that, yes.

24   Q.   And do you remember that the Court told you that the

25   Government and you agreed to recommend that she would impose a

1    sentence of 108 months imprisonment?

2    A.   I do recall that.

3    Q.   And you said when she asked you do you understand and

4    agree, you said yes, Your Honor.

5    A.   Do you mean the 108 months?

6    Q.   Yes.

7    A.   Yes.  Yes, I did know it was going to be 108 months.

8    Q.   Now, 108 months is significantly less than 240 months.

9    Correct?

10   A.   I suppose.

11   Q.   And it's nowhere near life.  Correct?

12   A.   Correct.

13   Q.   And do you remember the Court saying to you that you had

14   the right to appeal.  However, in paragraph 13 of your plea

15   agreement you were waiving your right to appeal your sentence

16   in exchange for the agreement that you negotiated with the

17   Government?

18   A.   What Zeljka explained to me, she did explain to me that I

19   had waived my right to appeal the sentence.  Now we are

20   discussing something that happened at the end of April.  In my

21   opinion, the pretrial motions, the appeal had already been

22   filed for the pretrial motion aspect.

23   Q.   I understand that you have testified to that, but what I am

24   asking you is if you remember that the Court said to you or

25   asked you whether or not you had discussed the appellate waiver

1    provision with your attorneys and that you were waiving your

2    right to appeal your sentence knowingly and voluntarily?

3        The Court asked if this was true and correct, and you

4    replied, "Yes, Your Honor."

5    A.   Based on my discussions with Zeljka and Alan Ross, I was

6    informed that I was not going to be able to appeal the

7    sentence.

8    Q.   The Court then asked you if there were any other promises

9    or assurances in exchange for your plea, and you replied, "No,

10   Your Honor."

11   A.   Exactly.

12   Q.   The Court then went over an entire list of rights that you

13   have.  Some of those include the right to bring witnesses, the

14   right to have your attorneys cross-examine, the right to

15   testify and that you were presumed to be innocent until the

16   Government proved their case against you, that you had the

17   right to be tried by a jury whom you and the Government would

18   select and that if you lost at trial you would have the right

19   to take an appeal.

20       The Court then said, "Do you understand by pleading guilty

21   you give up all of these rights we associate with trial, as

22   well as with appeal?"

23       And you responded, "Yes, Your Honor."

24   A.   As I said, these discussions were occurring at the end of

25   April.

1       In my head, my pretrial motion appeal had already been

2  filed.

3  Q.   But you never said that to the Court, did you?

4  A.   My attorneys did not advise me that I needed to tell them.

5  Q.   But you didn't ask the Court if you had a question.  You

6  didn't state that you didn't understand.

7  A.   I was depending on Zeljka completely, and if she had

8  already explained the areas that I was to say yes to and no to

9  and she said that I did not have to go into much discussions.

10  She told me not to talk.

11  Q.   But the Court was asking you questions and you were

12  answering.  Correct?

13  A.   As I had planned with my lawyers.

14  Q.   But at no time did you ask the Court for clarification on

15  the appellate issues, did you?

16  A.   According to what I understood in English and my level of

17  English comprehension, I heard them speak of sentence and

18  according to what Zeljka was telling me, this was fine.

19  Q.   Mr. Phillippe, did you have an interpreter at the plea?

20  A.   Yes.  There was always someone translating from Creole.

21  Q.   So there was no issue with your English, was there?

22  A.   But even the people that were translating, they were using

23  the word "sentence, sentence."

24  Q.   Mr. Phillippe, after being asked by the Court if you had

25  fully discussed with your attorneys the plea agreement and a

1   factual proffer, you then plead guilty to protecting drug loads

2   coming into Haiti from Colombia, did you not?

3   A.   I said that I discussed everything with my lawyers and

4   everything my lawyers said to say yes to I said yes and no to.

5   I said no according to what I had discussed and agreed with my

6   lawyers and I followed that exactly.

7   Q.   You plead guilty to receiving money to protect drug loads

8   and delivering that money into various banks, did you not?

9   A.   My lawyers told me that we would never be able to explain

10  which was about the money, about $76,000 that came into my

11  account in December of 2016 -- in 1999.  And he told me it was

12  a man by the name of Mr. Sony (phonetic) who made the deposits.

13  Q.   Mr. Phillippe, I am going to stop you because you are not

14  answering my question.

15      My question is, did you plead guilty?  And I will add, did

16  you sign a factual proffer that stated that you received money

17  for protecting loads of cocaine coming into Haiti from

18  Colombia?

19  A.   I will ask the lady to consider that you have to also

20  understand the reasons why the cause is if I acted in this way.

21  Q.   Mr. Phillippe, it's a simple yes or no.

22      Did you sign a factual proffer and plead guilty to

23  protecting loads of cocaine coming in from Haiti to Colombia?

24  A.   On the recommendation of my lawyer, yes, I had signed it.

25  Q.   And you were then presented to Judge Altonaga again for

```
 1   sentencing, were you not?

 2   A.   Yes.

 3   Q.   On June 21st, 2017?

 4   A.   Yes, June 21st.

 5   Q.   And on that day, the Court asked you if you had anything

 6   that you would like to say before she announced your sentence,

 7   and you replied, "No, thank you very much, Your Honor."

 8   A.   That's what my lawyers told me to say.  I don't know

 9   American law.  I saw how things were going on.  I was relying

10   on my lawyers.  He told me not to speak, I didn't speak.

11   Q.   Mr. Phillippe, you received a sentence of 108 months, did

12   you not?

13   A.   Yes.

14   Q.   Not a sentence of 20 years?

15   A.   (No verbal response.)

16   Q.   Not a life sentence?

17   A.   Correct.

18   Q.   Now, going back to your discussions, you indicate that you

19   had only spoken to Ms. Bozanic one time after your sentence?

20   A.   I said after the sentence she came to see me one time.

21   Q.   So how many times did you speak to her?

22   A.   I never spoke to her on the phone.  All the messages and

23   communications were either through my wife, my brother or

24   friends.

25   Q.   Did you ever e-mail her?
```

1    A.   After the sentence she said that Guy Phillippe was one of

2    the -- she had an interview where she said that Guy Phillippe

3    was one of the most honorable people she had the privilege of

4    serving.  I wrote to her saying, "Congratulations.  Thank you

5    very much for that interview."

6    Q.   How did you see the interview?

7    A.   I never saw it.  People sent me messages telling me about

8    it.

9    Q.   So you received messages about the different newspapers

10   articles about your case?

11        THE COURT:  Counsel, where are you going with this line

12   of questioning?

13        MS. KIRKPATRICK:  I have a very specific question next,

14   Your Honor.

15   A.   No, I never saw her -- no, I don't have the newspapers

16   because I don't have -- I didn't see the newspapers because I

17   don't have access to newspapers.

18   BY MS. KIRKPATRICK:

19   Q.   That was not my question, Mr. Phillippe.  My question was

20   whether people contacted you about the newspaper after your

21   sentence?

22   A.   First of all, I'd like to know which newspapers you are

23   referring to and I don't really remember.

24   Q.   I will move on.

25        You stated that Ms. Bozanic had given an interview?

```
1    A.   That's what friends wrote to me on e-mail.

2    Q.   And Mr. Ross gave an interview as well at the same time,

3    did he not?

4    A.   They didn't talk to me about Mr. Ross.  They talked about

5    Ms. Zeljka.

6    Q.   You are not aware that the Washington Times posted a quote

7    from Mr. Ross that said, "The Government compromised their

8    position by dismissing the more serious charges," said defense

9    attorney Alan Ross.  "We compromised our position by giving up

10   our pretrial motion, by pleading guilty and by not going to

11   trial."

12   A.   I didn't really know that and this is the personal opinion

13   of Mr. Ross.  That's not my opinion.

14   Q.   That was in an article posted by The Associated Press that

15   also contained quotes by Ms. Bozanic about your case but you're

16   telling us that you had never heard that article or that quote

17   before?

18   A.   No.

19   Q.   Going back to your contact with Ms. Bozanic, you stated

20   that all messages were through a third party.  You never

21   contacted her directly except to congratulate her on her

22   interview?

23   A.   I can't say 100 percent because it's more than a year, but

24   I know that I never spoke to her on the phone, maybe on e-mail

25   a few times.  And when I contacted O'Brien, I had contacted her
```

1    because I told her that I needed the papers to give it to my

2    lawyer who was taking care of the appeal now.

3    Q.   So you discussed an appeal with her?

4    A.   I didn't discuss it with her.  I just announced it to her

5    and told her that my lawyer needed the papers.

6    Q.   To file an appeal?

7    A.   Exactly.  I think it was while I was at the McKean prison

8    in either January 2018 or before.  I don't really remember.

9    Q.   I am a little confused.  When is it that you first realized

10   that no appeal had been filed?

11   A.   When I spoke to my lawyer O'Brien and officially told me

12   that nothing was done.  That's when I knew at 100 percent but

13   from the moment that that fellow inmate had told me about this

14   certain information, I started becoming suspicious that my

15   lawyers were playing on both sides.

16   Q.   And that you stated was in the beginning of July.  Correct?

17   A.   Yeah.

18   Q.   In 2017?

19   A.   I think it is indeed in July.  I don't know if it's at the

20   beginning or the end, but I do know it's in July.

21   Q.   But you never mentioned it to your attorneys?

22   A.   No, I wouldn't see why I would have spoken to them because

23   I am the one that took the decision to change them.

24   Q.   What you testified to is that you plead guilty, the Court

25   asked you if there were any other promises, told you that you

1    were giving up all of your rights to trial and appeal

2    associated with trial and sentencing.

3         You were then sentenced.  You had no questions for the

4    Court but that entire time you thought an appeal had already

5    been filed?

6    A.  I think that the Eleventh Circuit is very clear on this.

7    Q.  I am going to stop you, Mr. Phillippe.

8         THE COURT:  And I am going to stop you.  You are going

9    on the same material again and again.

10        MS. KIRKPATRICK:  Yes, if I may.

11   BY MS. KIRKPATRICK:

12   Q.  But you are saying you have never contacted your attorneys,

13   Ms. Bozanic or Mr. Ross, at the time about why they did not

14   file an appeal?

15        MR. PITZER:  Objection.

16   A.  I don't think I did that because when I decided to change

17   and make my decision, I had decided to go forward with the

18   change and no matter what they would have told me after I

19   wouldn't have paid attention to them.

20        THE COURT:  We have heard that before.

21        MS. KIRKPATRICK:  Your Honor, I apologize.  I have

22   gotten a little confused with the time frame.

23   BY MS. KIRKPATRICK:

24   Q.  Perhaps this will clarify why I am confused.

25        Your friend, Mr. Maxi, who testified, said that he told you

```
 1    that there was no appeal filed in June.
 2    A.  As I explained, he is a friend but he might be speaking
 3    under the influence of emotion.
 4       He doesn't know the law, and I think it's the first time
 5    that these friends of mine are involved in such a case.  So I
 6    wasn't going to be paying attention to what a simple friend was
 7    telling me.  I wanted to seek out the advice of a professional.
 8    Q.  But that was in June before your sentencing?
 9    A.  I can't really say.  I can't say exactly what time he spoke
10    to me.
11            MS. KIRKPATRICK:  Your Honor, I have nothing further.
12            MR. PITZER:  I finished this witness.  If Ms. Bozanic
13    is present, I will call her.
14            THE COURT:  The Court will be in recess for five
15    minutes.
16            COURT SECURITY OFFICER:  All rise.
17            (Brief recess.)
18            (Call to the order of the Court.)
19            THE COURT:  Is this your last witness?
20            MR. PITZER:  It is.
21            THE COURT:  How long will this be?
22            MR. PITZER:  I think about 15 minutes.
23            THE COURT:  Then there will be cross-examination.
24            MS. KIRKPATRICK:  Yes, Your Honor, although that would
25    be odd because she is my only witness.
```

```
 1              THE COURT:  She is your witness.

 2              MS. KIRKPATRICK:  Yes, she is.

 3              THE COURT:  Okay.  Let's go ahead through this and see

 4    if we can end this.

 5              You are going to be 15 minutes.

 6              All right.  Let's get started here.

 7              MR. PITZER:  It's a legal 15 minutes.

 8              THE COURT:  Okay.

 9              MR. PITZER:  I'll do my best.

10              THE COURT:  No, just do what you have to do.

11              COURTROOM DEPUTY:  Please raise your right hand.

12              (The witness, Zeljka Bozanic, was duly sworn.)

13              COURTROOM DEPUTY:  Please take a seat and please state

14    your name and spell your last name for the record.

15              THE COURT:  Zeljka Bozanic, B O Z A N I C.

16                        DIRECT EXAMINATION

17    BY MR. PITZER:

18    Q.  Maybe as a help to the court reporter you can spell your

19    first name too.

20    A.  Z-E-L-J-K-A.

21    Q.  That's pronounced Zeljka?

22    A.  Zeljka.

23    Q.  And your professional address?

24    A.  2847 Hollywood Boulevard, Hollywood, Florida, 33020.

25    Q.  And you are an attorney.  Correct?
```

1   A.   Yes.

2   Q.   Does your practice concentrate in any specific area?

3   A.   Criminal defense.

4   Q.   Criminal defense.  All right.

5        How many federal criminal cases have you tried to verdict?

6   A.   Federal?

7   Q.   Yes.

8   A.   I would say about six or seven.

9   Q.   Okay.  And you handle federal appeals?

10  A.   No, I don't.  Well, I am licensed in court of appeals and I

11  have filed maybe a few.  But that's not really what I like to

12  do.

13  Q.   Have you ever argued any cases before the Eleventh Circuit?

14  A.   Yes.

15  Q.   How did you come to represent Guy Phillippe?

16  A.   I believe I got a call from his wife right after he was

17  arrested.

18  Q.   How did you respond to that?

19  A.   I went to see him.

20  Q.   And he engaged you or somebody retained you?

21  A.   Yes.

22  Q.   Who retained you?

23  A.   He said he wanted me to represent him and his wife also

24  agreed to finance or pay for the services.

25  Q.   Was there a plea agreement written or oral?

```
 1   A.   Yes.  I don't -- I think I did it.  We never ended up

 2   signing it but we had an oral agreement.

 3   Q.   What was your recollection of your oral agreement?

 4   A.   As far as the pricing?

 5   Q.   Yes, ma'am.

 6   A.   It was going to be $60,000 if the case did not go to trial

 7   or $100,000 if it goes to trial.

 8   Q.   Who was committing to pay the fee?

 9   A.   Natalie Phillippe who was at the time collecting money

10   from, I guess, the Haitian people.  I am not sure where she was

11   getting it but I know she was trying to get donations for his

12   legal representation.

13   Q.   What, if any, portion of your fee was ultimately paid?

14   A.   She paid a down payment of 5,000.  After that,

15   Mr. Phillippe asked his cousin by the name of Junior to send me

16   some money.  He sent me 3,500 and they never paid anything else

17   after that.

18   Q.   So how much total did you collect on this case, if you

19   know?

20   A.   8,500.

21   Q.   8,500?

22   A.   Yes and Mr. Phillippe said that he would pay once he got

23   out or made some promises that, obviously, never happened.

24   Q.   What was the day of your initial meeting with

25   Mr. Phillippe?
```

1  A.   I would have to look at my notes.  I believe it was the day

2  after he was arrested or brought over here.

3  Q.   And after speaking to Mr. Phillippe and studying whatever

4  documents you studied, did you assess his case?

5  A.   Well, not on the first day.

6  Q.   No, I say after meeting with him and then studying

7  documents and things of that nature.

8  A.   Yes.

9  Q.   What was your initial assessment of the case?

10  A.   We were getting ready to go to trial.  I was convinced this

11  was going to be a trial case.

12  Q.   Did you, at any time, conclude that there would be some

13  appropriate pretrial motions to file?

14  A.   Yes.

15  Q.   And what were those?

16  A.   There were three motions we filed.  At that time Alan Ross,

17  co-counsel, also came in on the case and even though he didn't

18  file a notice of appearance right away, he was working on the

19  motions with me.  So I ended up filing three motions which were

20  motions to dismiss for lack of personal jurisdiction, I

21  believe.  There was a motion to abate based on sovereign

22  immunity and motion to dismiss based on the post indictment

23  delay.

24  Q.   It was you in concert with Mr. Ross who prepared those

25  motions?

```
1    A.   Yes.

2    Q.   And those motions were filed and ruled on before Mr. Ross

3    formally appeared on the case.

4         Is that correct?

5    A.   I believe -- I don't remember exactly but I believe that he

6    filed a notice of appearance the day after they denied the

7    motions because I believe he wanted to make sure he got a

8    portion of his fee before he entered a notice of appearance.

9    Q.   I understand.

10        After the motions were denied, do you recall your client,

11   Mr. Phillippe, telling you and your co-counsel, Mr. Ross, that

12   he wanted to appeal?

13   A.   Yes.

14   Q.   Do you recall how you responded to that?

15   A.   We actually had conversations about the appeal.  We thought

16   about filing a writ of prohibition which would have delayed

17   Mr. Phillippe's case.

18        At the time we were still planning to go to trial and one

19   of the issues was that it was going to delay his trial date.

20   So we discussed it.  Mr. Ross, who is obviously not with us

21   anymore, he suggested that we hire somebody who specializes in

22   those type of motions and appeals and he suggested another

23   attorney.

24        We had conversations about it and we decided to file -- if

25   any appeal was going to be filed it would be after the case --
```

1   after we went to trial because at that time we were still

2   planning to go to trial.

3   Q.   Was that other lawyer attorney Waxman?

4   A.   Yes.

5   Q.   Guy, was he ever involved with any discussion with attorney

6   Waxman, to your knowledge?

7   A.   I really don't know because Alan Ross was friends with

8   Waxman.  I don't really know Mr. Waxman that well.  He is the

9   one that called Benjamin Waxman and asked him for the fee, for

10  him to state a fee of how much he would work for.

11       Then Mr. Ross spoke to Mr. Phillippe and I believe his

12  wife.  I don't really know whether he spoke to the wife,

13  actually.

14  Q.   Okay.  When you interviewed Mr. Phillippe about the case

15  and about the charges against him, what was his position on

16  innocence or guilt?

17  A.   Well, he always remained that he was innocent and wanted to

18  go to trial.

19  Q.   Right.  As the case proceeded, the decision to try the case

20  changed.  Correct?

21  A.   Yes, towards the end.

22  Q.   And there was ultimately a decision to enter a plea, a

23  negotiated plea?

24  A.   Right.

25  Q.   Can you edify us on what changed?

1  A.   We got some additional CDs from the Government at one

2  point.   That was one of the reasons we asked for a continuance

3  because at the beginning we didn't want to waive speedies

4  because we wanted to make sure we could go to trial as soon as

5  possible.

6      After we took a continuance, there was more discovery

7  provided by the Government.   We found out who potential

8  witnesses were going to be that would say that Mr. Phillippe,

9  you know, trafficked drugs or so.   I believed -- I personally

10 believed that most of those people were making up stories and I

11 felt comfortable with the drug trafficking charge.

12     However, the money laundering charge, there were some

13 deposits that were made and we couldn't get the bank records

14 from so many years ago.   So Mr. Ross was more of the opinion

15 that maybe we should talk about a plea and I think

16 Mr. Phillippe started -- I don't know what happened but he

17 started talking to us about possibly what would the plea be.

18     There was also some other issues that came up that I don't

19 even know if you want me to talk about something about -- some

20 other stuff Mr. Phillippe didn't want to come out.

21 Q.   All right.   Okay.   In relation to the pretrial motions, was

22 there a hearing?

23 A.   No, the judge just ruled on it.

24 Q.   In terms of negotiating the plea, did you or Mr. Ross

25 discuss trying to negotiate an Alford plea?

1    A.   No.

2    Q.   Did you consider it?

3    A.   No, I don't -- when we started negotiating with the

4    Government, the main thing that we all thought was the most

5    important thing was to talk about dropping the drug trafficking

6    charge because Mr. Phillippe was very concerned about pleading

7    to that.  And obviously, he had higher guidelines.  It was kind

8    of difficulty to negotiate with the Government because they

9    didn't want to budge that much so just getting that done was a

10   big deal to us.

11   Q.   Okay.  So you were happy with the progress you made in

12   terms of the plea negotiation?

13   A.   In terms of the plea negotiations, yes.

14   Q.   And who -- who took the lead on that?  Was that Mr. Ross?

15   Was that you or was that working in concert on that?

16   A.   As far as talking to Mr. Phillippe about the plea.

17   Q.   No, the Government?

18   A.   Oh, I think we both did it.

19   Q.   Okay.  Ultimately there was a plea agreement and you

20   reviewed the plea agreement with Mr. Phillippe.  Correct?

21   A.   Yes.

22   Q.   Did he have any questions about any of the language or any

23   of the conditions outlined in the plea agreement?

24   A.   I can't recall any specific questions.  I mean, we went

25   into details.  We went paragraph by paragraph and we explained

1    that the reason why the Government was breaking down, you know,

2    dismissing the drug trafficking count was because he would

3    plead to money laundering and that was the only way to bring

4    his guidelines down to about nine years.

5    Q.   Okay.  Then the matter proceeded to a change of plea

6    hearing.  Correct?

7    A.   Yes.

8    Q.   And you were with Guy at the change of plea hearing?

9    A.   Yes.

10   Q.   And you discussed that hearing and what was going to go on

11   prior to the hearing?

12   A.   Yes.

13   Q.   And basically told him there are going to be certain

14   questions that the Court is going to be asking and things of

15   that nature.

16        Right?

17   A.   Correct.

18   Q.   And then you were present in court when the colloquy with

19   the Court occurred.  Correct?

20   A.   Yes.

21   Q.   Did Guy have any questions about anything that the Court

22   advised him of during that colloquy?

23   A.   I haven't reviewed the transcript.  Based on my

24   recollection, I don't believe so, but you could look at the

25   transcript.

1   Q.   All right.  Guy then, at a future time, was sentenced by

2   Judge Altonaga.   Correct?

3   A.   Correct.

4   Q.   And after Guy's sentencing, when, if ever, did you have

5   further communicate with him?

6   A.   Based on my notes, I know that I went to see him on

7   July 5th and we talked some more and we communicated through

8   e-mail.  I don't remember whether I saw him between the

9   sentencing date, which I believe was 6/21 or 6/23.  I don't

10  remember exactly or July 25th -- I don't remember if I went to

11  the lockup to talk to him after he was sentenced.  I just don't

12  recall.

13          MR. PITZER:  That's all have I for this witness, Your

14  Honor.

15          THE COURT:  Okay.  Cross-examination.

16          Now, are you going to cross and then have her as

17  direct.

18          MS. KIRKPATRICK:  I was going to ask the Court for a

19  little guidance on that.  Cross her first on what she just

20  testified and then re-present her.

21          THE COURT:  Sure.

22          MS. KIRKPATRICK:  Okay.  Judge, thank you.

23                          CROSS-EXAMINATION

24  BY MS. KIRKPATRICK:

25  Q.   Ms. Bozanic, when you discussed the plea agreement with

1   Mr. Phillippe, did you discuss the maximum term of imprisonment

2   that he would have faced with the drug charge as well as with

3   the money laundering charge?

4   A.  Yes.

5   Q.  So he was aware that the drug charge carried a life

6   imprisonment and a mandatory minimum of ten years?

7   A.  Yes, that was one of the reasons why we started talking

8   about the plea.

9           MS. KIRKPATRICK:  Okay.  Your Honor, I have nothing

10  further for cross-examination.

11          THE COURT:  Okay.  You can wear your other hat now.

12          MS. KIRKPATRICK:  Thank you, Your Honor.

13          MR. PITZER:  I have nothing further, Your Honor.

14          THE COURT:  Okay.

15          MS. KIRKPATRICK:  Your Honor, at this time the

16  Government will call Ms. Zeljka Bozanic who I believe is still

17  under oath.

18          THE COURT:  Okay.  She is.

19          (The witness, Zeljka Bozanic, was previously sworn.)

20                      DIRECT EXAMINATION

21  BY MS. KIRKPATRICK:

22  Q.  Ms. Bozanic, you represented Mr. Phillippe during the trial

23  and sentencing phases.  Is that correct?

24  A.  Yes.

25  Q.  And you asked for or requested the services of Mr. Ross to

1    come in and assist you?

2    A.   Well, I didn't really ask for it.  The family started

3    talking about hiring another attorney and after they gave a few

4    names which were civil attorneys or people I didn't even know

5    about, I suggested they talk to a few criminal defense

6    attorneys and I suggested that Alan Ross was one of the best so

7    I put them in contact with Alan Ross.

8            MS. KIRKPATRICK:  Your Honor, may I have a little

9    leeway in going through leading questions that were already

10   asked just to speed things up a little bit?

11           THE COURT:  Yes.

12   BY MS. KIRKPATRICK:

13   Q.   Thank you, Your Honor.

14        You testified earlier that you filed three pretrial motions

15   to dismiss?

16   A.   Yes.

17   Q.   They were denied by the Court?

18   A.   Correct.

19   Q.   And that you had conversations and had intended to appeal

20   the denial of those motions?

21   A.   Yes.

22   Q.   And discussed I believe you called it a writ of prohibition

23   or an interlocutory appeal?

24   A.   Yes.

25   Q.   During those conversations, what -- was Mr. Phillippe

1   involved in those conversations?

2   A.   Yes.

3   Q.   What was the main concern?  I believe you already said

4   timing but were there any other concerns?

5   A.   It was timing because we didn't want to waive the speedy

6   trial at that time.  Another thing was hiring the other

7   attorney who was charging I don't know how much but it was a

8   lot of money and his family couldn't do it.  But the biggest

9   concern was the timing and we just all agreed that we are going

10   to go to trial and we are going to do the appeal after that at

11   the time.

12   Q.   And Mr. Phillippe was involved in those discussions?

13   A.   Yes, it was me.  He spoke to me and Mr. Ross.

14   Q.   Okay.  When the decision was made to enter into

15   negotiations for a plea, was Mr. Phillippe involved in those

16   decisions?

17   A.   Of course.

18   Q.   And when you discussed the matter with Mr. Phillippe, can

19   you please tell the Court what came up as far as any type of

20   appeal either of the motions or the convictions, anything?

21   A.   When we talked about the -- first of all, I was against him

22   taking a plea from the beginning.  Mr. Ross was, I think, more

23   on Mr. Phillippe's side that he should take a plea, that we

24   should try to get a plea for money laundering.  I wanted to go

25   to trial but, obviously, it wasn't my decision.

1        When we finally spoke to the Government, which was you and

2   Mr. Camacho, and we talked about possibly getting to the

3   guidelines of nine years, one of the conditions was that,

4   obviously, you didn't know whether we were going to go to trial

5   and win or go to trial and lose and then still be able to

6   appeal the motion.  So we agreed to give up our right to appeal

7   anything, including the motions in exchange for the

8   recommendation of nine years and pleading to money laundering

9   only.

10  Q.  What did you or Mr. Ross, if you were present, tell

11  Mr. Phillippe with regard to the case itself, whether there was

12  anything pending or after the plea?  What would the plea have

13  as an effect on his case?

14  A.  There was nothing pending after the plea.  He knew and it

15  was explained to Mr. Phillippe that once he took a plea, that

16  was it.  He would most likely, if the judge agreed with our

17  recommendation, get 108 months.

18  Q.  Did you ever comment about anything regarding the appeal?

19  A.  No, we didn't have any discussions about the appeal or

20  filing an appeal after he took the plea.

21  Q.  Once the Government made a recommended sentence to resolve

22  the case, did you make any further comment about whether or not

23  you guys did file an appeal or what effect it would have had?

24  A.  I made a comment to Mr. Ross and or Mr. Phillippe that good

25  thing we didn't file an appeal earlier before he took a plea

1   when we planned on going to trial because we wouldn't have that

2   upper hand.  I don't know that he would still offer the nine

3   year plea if we would have lost the motions or if they got

4   affirmed on the Eleventh Circuit.

5   Q.   How long have you been a lawyer?

6   A.   Thirteen years, 13 or 14 years.

7   Q.   Would you consider yourself extremely experienced in

8   criminal law in the Southern District of Florida?

9   A.   Yes.

10   Q.   Do you think that his plea was a good deal for

11   Mr. Phillippe?

12   A.   Yes, I think it was a very good deal considering that he

13   avoided life and the guidelines that were at least 15 years.

14   Q.   Now, fast forwarding to sentencing in late June, did you

15   meet with him prior to his sentencing?

16   A.   Of course.

17   Q.   Did you go over the PSI or Presentence Investigation

18   Report?

19   A.   Yes, on June 7th I went over the PSI with him.

20   Q.   Were there any objections filed to the PSI?

21   A.   No, we actually filed a paper with the signature on

22   June 7th saying there were no objections.

23   Q.   And after the sentencing, did Mr. Phillippe ask you

24   anything about the appeal?

25   A.   No.

1   Q.   Did he ask you anything about the appeal between the plea

2   and the sentencing?

3   A.   Between the plea and the sentencing, no.  We went over the

4   appellate waiver and we also talked to him about the fact that

5   he is giving up his right to appeal the motions and anything in

6   exchange for the plea that he was getting.

7   Q.   I'd like to get into the contact that you have had with

8   Mr. Phillippe since the time of sentencing.

9        Did you bring with you your file today?

10  A.   Yes, I did.

11  Q.   And did you provide me just a few minutes ago with e-mails

12  and texts between you and your client or family members?

13  A.   Yes, whatever I could find.

14  Q.   Do you remember when the first time is that you spoke with

15  him after his sentencing?

16  A.   Based on my file, I know that I went to see him on

17  July 5th.  I don't recall whether we spoke through e-mail or

18  any other way before that because that's the time we had

19  because I think I sent an e-mail to FDC.

20  Q.   I am going to hand you what has been previously marked as

21  Government Exhibit 6, 7, and 8.

22        MS. KIRKPATRICK:  Because I just received them, I don't

23  have a copy to provide to defense counsel.  If I can go into a

24  different line of questioning and provide these to him so he

25  can review.

```
 1    BY MS. KIRKPATRICK:

 2    Q.   To the best of your recollection -- I'm sorry, when did you

 3    say you think you first met with him prior to the sentencing?

 4    A.   Based on what I have in my file it's July 5th.  I don't

 5    recall if I met with him before that.  I don't keep all my

 6    e-mails to FDC.

 7    Q.   Did you discuss anything about an appeal during that visit?

 8    A.   No.

 9    Q.   In fact, what was the topic of discussion?

10    A.   We mostly talked about -- I think he wanted me to assist

11    him in getting some journalist in because he wanted to tell his

12    side of the story to the Haitian media, and I know that there

13    were a few people that were trying to interview him.  So I said

14    I would help in getting them into FDC or giving them the

15    paperwork that they needed to fill out in order to get

16    approved.

17    Q.   On that day -- again, there was no mention of appeal?

18    A.   No, we didn't talk about an appeal.

19    Q.   When was the last time you had any contact with him?

20    A.   I don't recall actually seeing him.  Sometimes when I go

21    see other clients I just call them down and talk to them or say

22    hi.  I just don't have any recollection whether I spoke to him

23    in person after that.

24    Q.   But you did see him after that?

25    A.   I don't know whether I saw him after July 5th.  It is
```

```
 1   possible because I think I would have gone to see him at least

 2   once before he got moved but I can't tell you for sure.

 3   Q.   Did you receive any contact from him?

 4   A.   We talked through e-mail.  I would check up on him once in

 5   a while and he would e-mail me.

 6   Q.   Any questions about a visit, I mean, about the appeal at

 7   all?

 8   A.   We never talked about the appeal after the sentencing.

 9   Q.   What, if anything, was the subject of those e-mails?

10           MR. PITZER:  Objection.

11           Your Honor, would the Court indulge me about a two

12   question voir dire of the witness before we get into these

13   e-mails.

14           THE COURT:  Okay.  So you are objecting to the question

15   that you want to ask questions about?

16           MR. PITZER:  I just wanted to voir dire the witness

17   about the e-mails, just two questions.

18           THE COURT:  Counsel.

19           MS. KIRKPATRICK:  Your Honor, I have no objection to

20   that.  That's fine.

21           THE COURT:  Okay.  Let's do it since we are in this

22   strange procedure.

23           Go ahead.

24           MR. PITZER:  Ms. Bozanic, you have provided certain

25   documents today by way of e-mails and text.  Correct?
```

```
 1              THE WITNESS:  Yes.

 2              MR. PITZER:  Do you recall my calling you about this

 3    case at one point in time?

 4              THE WITNESS:  Yes.

 5              MR. PITZER:  Do you recall my asking you during that

 6    phone call whether or not there were any e-mails and texts?

 7              THE COURT:  Counsel, could you go through to the

 8    microphone, please?

 9              MR. PITZER:  Whether or not there were any e-mails and

10    text that you had in relation to this case.

11              THE WITNESS:  Yes.

12              MR. PITZER:  Do you remember the response?

13              THE WITNESS:  I told you that my CorrLinks accounts are

14    deleted because they delete after 30 or 60 days.  So what I did

15    after I spoke to you and before the last hearing when we were

16    supposed to be here, I went and pulled all my e-mails with Guy

17    Phillipe and I found some e-mails that my secretary had

18    checked.  The way it works, if I can explain, when I get the

19    CorrLinks e-mail, sometimes I go on my phone and check it

20    myself and it stays in CorrLinks.

21              My secretary, if she gets to it first, she will e-mail

22    me, for example, if Guy Phillips, e-mails me on July 5th, she

23    will e-mail me, just forward the e-mail and just copy and paste

24    from CorrLinks and e-mail me what he said.  And I will e-mail

25    her back and say, okay, say this or go into CorrLinks some
```

1    other time and e-mail back.

2          So when you asked me whether I had any CorrLinks saved,

3    I don't have CorrLinks because they get deleted and at that

4    time I wasn't even thinking about Mr. Phillips case.

5          After Ms. Kirkpatrick or Mr. Camacho asked me if there

6    was anything I had, I went back into my e-mails and I was able

7    to find one or two e-mails.

8          MR. PITZER:  All right.  Thank you, Your Honor.

9          THE COURT:  You don't have a motion?

10         MR. PITZER:  I do, Your Honor.

11         Based on the responses to my voir dire questions, I am

12   going to ask the Court to exclude any of the e-mails and texts

13   because I was led to believe that, as the witness has now

14   candidly admitted, that she didn't think she had any.

15         THE COURT:  Okay.  How long ago was it that you asked

16   for those documents?

17         MR. PITZER:  Was that 60 days, maybe?

18         THE WITNESS:  It was at least a little bit before the

19   last setting before it got continued.  I can look on the phone

20   and see when I got the message.

21         MR. PITZER:  It's been a while.

22         THE WITNESS:  I have it in my phone, Judge, if you'd

23   like me to look at it.

24         THE COURT:  Let me take a look at the documents.

25         Counsel, now that you have seen those documents, would

1  you like to ask her some questions about those documents or are

2  you saying that your case is being severely prejudiced as a

3  result of you not having those documents?

4         MR. PITZER:  Well, it's a bit -- I am in a bit of an

5  awkward position because I haven't even had time to read them.

6  It's hard to un ring the bell but I am not even sure that they

7  are damaging.  I just don't know.

8         MS. KIRKPATRICK:  Your Honor, I may be able to do this

9  without the actual introduction of the e-mails.

10        I don't think that the actual introduction of them is

11 that important.  I can do it by a general question to her about

12 the communications that she has had with Mr. Phillippe.

13        THE COURT:  Counsel, does that satisfy you?

14        MR. PITZER:  I have no problem with that.

15        THE COURT:  Okay.  Let's do it that way.

16        MS. KIRKPATRICK:  Judge, there is one additional

17 exhibit, however.  I am not sure if this is also subject, but

18 it is a letter from Mr. Phillippe to Ms. Bozanic.

19        I don't know if that was inquired about?

20        MR. PITZER:  It wasn't.  Your Honor, I did not inquire

21 about written communications such as letters.

22        THE COURT:  Okay.

23 BY MS. KIRKPATRICK:

24 Q.  Ms. Bozanic, I apologize.

25        So, going back to July, you said that you met with

```
 1  Mr. Phillippe and that you had then had some communication

 2  after that with him.  And I believe that's when we got into the

 3  e-mails.

 4  A.  Yes.

 5  Q.  Do you remember ever receiving an e-mail communication or

 6  any other type of written communication from Mr. Phillippe

 7  regarding an appeal?

 8  A.  No.

 9  Q.  Would you say that you had received multiple communications

10  from Mr. Phillippe?

11  A.  Yes.

12  Q.  And none of those contained a question about the appeal?

13  A.  No.

14  Q.  I am going to ask you to speak up just a little bit into

15  the microphone.

16  A.  No, none of them were about an appeal.  I know he was

17  hiring a lawyer to sue the Haitian government.  One of the

18  e-mails was about that, to get out early, but we never spoke

19  about an appeal.

20        THE COURT:  Counsel, before you do that, ask this

21  question, what was the time span of those e-mails?

22        MS. KIRKPATRICK:  Yes, Your Honor.

23  BY MS. KIRKPATRICK:

24  Q.  What is the time span of the communications from

25  Mr. Phillippe to you?
```

```
 1    A.   I know one of the e-mails was on July 7th.  I know one of

 2    the e-mails was around October and I would need to re-refresh

 3    my recollection on the dates based on the exhibits that you are

 4    not going to introduce.

 5    Q.   That's okay.  So, sometime in October?

 6    A.   October or November, the last e-mail was that he was going

 7    to sue the Haitian government.  I just basically e-mailed him

 8    to see how he was doing because I never heard from him after he

 9    was in the SHU in another facility and once he got out he said

10    he was good.

11    Q.   Did you receive communication from family members?

12    A.   Around September his wife e-mailed me asking me for help

13    because he was in the SHU or lock up and hadn't heard from him

14    because he was transferred to another facility.  And I

15    explained maybe at the beginning they put him in the SHU

16    because of him being a political figure.  And then I think in

17    October his cousin, Junior, texted me asking me if I can do

18    something and call the prison to see what's going on with him

19    being in the lockup.

20    Q.   Now, going back to Natalie Phillippe's communication, you

21    indicated that was in September of 2017?

22    A.   I believe so, yes.

23    Q.   Did she mention appeal at all?

24    A.   No, it was right after hurricane Irma.  I know her e-mail

25    was very nice and asked me if I was okay and my family was okay
```

 1   and she mentioned Mr. Phillippe's situation.

 2   Q.   After that, did you receive any communications from

 3   Mr. Phillippe regarding hiring any new counsel?

 4   A.   Yes.  There was an e-mail, as I said, in October or

 5   November.  When I asked him how he was doing, he said he was

 6   looking for an attorney to sue the people who kidnapped him and

 7   I presume that was the Haitians but I really don't know what it

 8   was.

 9   Q.   Nothing about an appeal?

10   A.   No.

11   Q.   Did he indicate where that attorney was located?

12   A.   I think he said in New York.

13   Q.   Now, you indicated you had received a communication from

14   someone named Junior?

15   A.   Yes.

16   Q.   I believe you said in October.  Had you contacted that

17   individual?

18   A.   No.

19   Q.   Can you describe for the Court what the content of those

20   communications were, if you remember?

21   A.   The only time I spoke to Junior was once in June because

22   Guy asked him, Mr. Phillippe asked him to make a payment and he

23   sent me $3,500.  I think it was a wire to my bank account and

24   he just texted me saying, I sent it.  I got it.  Thank you.

25   That was it.

1       Then the next time I spoke to Junior was in October because

2   he texted me on October 2nd and then on October 4th it was

3   about Mr. Phillippe's custody stature the fact that he was in

4   the SHU and one of his text messages was something to the

5   effect that anything yet, did you call.

6       Then I asked my paralegal to call the facility and see

7   what's going on and why he was in the SHU.

8   Q.   And that related to the SHU?

9   A.   Yes, and that was the only time I ever spoke to him.

10  Q.   Any question about an appeal?

11  A.   I don't even think Mr. -- I don't know his last name, but

12  Junior didn't even -- his English was so bad, I never even

13  talked to him about an appeal.  I didn't even talk to him about

14  the case.

15  Q.   Now, I am going to show you what has been previously marked

16  as Government's Exhibit Number 8.

17      May I approach, Your Honor?

18          THE COURT:  You may.

19  BY MS. KIRKPATRICK:

20  Q.   Do you recognize that?

21  A.   Yes.

22  Q.   Can you please tell the Court what it is?

23  A.   It is a handwritten letter from Mr. Phillippe dated

24  January 2nd, 2018.

25  Q.   Could you please tell the Court -- actually, Your Honor, at

1   this time I would move to admit Government Exhibit Number 8.

2          THE COURT:  Any objection?

3          MR. PITZER:  No objection.

4          THE COURT:  Admitted.

5          (Government's Exhibit 8 was admitted in evidence.)

6   BY MS. KIRKPATRICK:

7   Q.   Could you please read that for the Court?

8   A.   Well, dated January 2nd, 2018.  "Hi, Zeljka, how are you?

9   I hope you had wonderful holidays.  I am okay trying to

10  survive.  Thanks for the documents.  I'd like you to send the

11  bank statements and checks if possible.  I really need them.  I

12  also need a copy of the metal (Secretary of Defense.)  Thanks,

13  and happy new year, Guy Phillippe."

14  Q.   Any mention of an appeal?

15  A.   No.

16  Q.   And that was January this year?

17  A.   January of 2018.

18          MS. KIRKPATRICK:  Your Honor, at this time the

19  Government would move to admit the rest of the exhibits, which

20  are part of the court record, 1 through 4.

21          Government Exhibit Number 1 is the plea agreement taken

22  off of CM/ECF.

23          Government Exhibit 2 is the factual proffer.

24          Government Exhibit 3 is the plea transcript.

25          Government Exhibit Number 4 is the sentencing

1      transcript, and Government Exhibit Number 5 is the article

2      previously mentioned by the Government and quoted in the

3      Government's response.

4              THE COURT:  Any objection?

5              MR. PITZER:  No, Your Honor.

6      (Government's Exhibits 1 through 5 were admitted in evidence.)

7              THE COURT:  Okay.  Anything else?

8              MS. KIRKPATRICK:  Nothing further, Your Honor.

9              THE COURT:  Okay.  Thank you.

10             MS. KIRKPATRICK:  And Government Exhibit 6 and 7 would

11     be withdrawn pursuant to the discussion we just had.

12             THE COURT:  Okay.

13             MS. KIRKPATRICK:  I have nothing further from this

14     witness, Your Honor.

15             THE COURT:  Thank you.

16             Counsel, anything else from this witness?

17             MR. PITZER:  If I can have just one minute to look at

18     my notes, please.

19             THE COURT:  Sure.

20             MR. PITZER:  We have nothing further from this witness.

21             THE COURT:  Thank you, you may be excused.

22             MS. KIRKPATRICK:  Nothing further from the Government.

23             MR. PITZER:  Nothing further from the plaintiff, Your

24     Honor.

25             THE COURT:  Counsel, may I hear your argument?

```
 1            MR. PITZER:  May it please the Court, Counsel.

 2            Your Honor, I am going to be very brief.  I know the

 3      Court has reviewed the pleadings filed in this matter.  I know

 4      the Court is well aware of the applicable laws, so I am not

 5      going to bore the Court with any of that.  I am going to try to

 6      cut this to what I consider the quick, and that is this.

 7            This case is unusual, the first one I have seen quite

 8      like it where I have a defendant who clearly was very

 9      passionate about certain pretrial motions and the merit of

10      those, that by his testimony which was confirmed by

11      Ms. Bozanic, that after those three motions were denied, he

12      immediately indicated that he wanted an appeal filed.

13            He has testified that he thought an appeal was filed

14      and from that point on he didn't worry about it again.  I think

15      that the misimpression is borne out by the testimony of his

16      wife and his friend when they tell us how upset he was and I

17      think the other term was concerned.

18            I know that the other side of this coin is, well, yes,

19      but giving up those pretrial motions was part of the

20      consequence of entering the plea.

21            Unfortunately, I don't think that Guy Phillippe

22      understood that.  He thought, mistakenly, that he had, as he

23      testified, 14 days to get that appeal filed and he was

24      concerned about the time frame and the timing of it.  That

25      rightly or wrongly when he asked his lawyers to file it, and
```

1   Ms. Bozanic said that they told him that they would -- I don't

2   want to misquote her but I think it was basically, we are going

3   to -- she didn't say we filed it or we are going to file it.

4   She said something more equivocal than that, but he interpreted

5   that to mean that, yes, you are going to be okay, yes, we are

6   going to file your appeal and that from that point on he

7   thought it was filed.

8        When he found out it wasn't, he was more than

9   concerned.  He was devastated because he was always hopeful

10  that he would basically be ultimately vindicated and exonerated

11  by rulings on those pretrial motions.

12       The Court has heard the testimony, and, again, I am not

13  going to regurgitate what's already been written and I am going

14  to submit it on that basis.

15       Thank you very much, Your Honor.

16       THE COURT:  Okay.

17       MS. KIRKPATRICK:  Your Honor, may it please the Court

18  and Counsel.

19       Ms. Bozanic and Mr. Ross acted in a professionally

20  reasonable manner.  I would even argue that they acted beyond

21  that.

22       These are two very experienced trial attorneys who had

23  discussions with Mr. Phillippe about whether or not to appeal

24  the denial of pretrial motions; pretrial motions not based on

25  his innocence or his guilt but based on specific arguments of

1   why the defendant's case should not be brought in the Southern

2   District of Florida at that time.

3       You heard the testimony, Your Honor, that Ms. Bozanic

4   repeatedly said to Mr. Phillippe that they wanted a quick trial

5   and she wanted to go to trial and they planned on going to

6   trial.

7       Everything makes sense to that point.  It was

8   reasonable that she would have discussed the possibility of

9   appealing either on an interlocutory basis or after his trial

10  if he was found guilty, but everything changed, Your Honor.

11      Everything changed at the defendant's decision.  He

12  received an incredible deal on behalf of the Government.

13      He was not charged -- he was not convicted of a drug

14  offense where the mandatory minimum was ten years and the

15  maximum was life.  He instead plead guilty to a money

16  laundering offense that limited his liability and received a

17  joint recommendation of nine years.  That was an incredible

18  deal and it makes every sense in the world that he took it as a

19  reasonable defense would have done.  Every effort in the entire

20  judicial system was made to ensure that this plea was taken

21  pursuant to Rule 11.

22      Judge Altonaga asked him repeatedly whether he

23  understood everything, and this self-proclaimed absolute

24  educated man and his family members who were virtually obsessed

25  with the case all following the case at no time asked

1    Ms. Bozanic what about the motions to dismiss.

2         I would ask the Court to find that the testimony on

3    Mr. Phillippe that he had asked about the appeal or even the

4    testimony of Mrs. Phillippe that she brought up the appeal or

5    the testimony of the friend who now says that he told him in

6    June but yet no questioning whatsoever of an appeal was made by

7    Mr. Phillippe to his attorneys at his own admission that all of

8    that is it not credible testimony.

9         I would ask that the Court find that Ms. Bozanic's

10   testimony was, in fact, the credible testimony of a highly

11   experienced credible lawyer who did everything she could in

12   this case bringing the defendant the absolute best deal that he

13   ever would have received and that she did so in a way that was

14   professionally, not only reasonable but I would say

15   exceptional.

16        You heard her testify that at no time did he ask.  Yet,

17   if he was so concerned about this 14 to 15 days, that would

18   have expired in May.  She remained his attorney through the

19   sentencing, at the very least, and remained in contact with him

20   well into 2017, even receiving a letter from him in 2018.

21        This is a persistent determined individual.  He

22   overthrew Aristide.  He led an army that caused a revolution in

23   Haiti.  He is well educated.  I would ask the Court to find

24   that when he sits here and testifies that he expected an appeal

25   to be done, yet had no qualms about not asking about it ever

1   again after his plea of guilty that that is not credible, that

2   the attorneys, Ms. Ross -- I'm sorry, Mr. Ross and Ms. Bozanic

3   acted in an exceptional manner, certainly in no way, shape or

4   form coming near meeting the standard of Strickland V

5   Washington.

6          Nothing further, Your Honor.

7          THE COURT:  Counsel, anything else?

8          MR. PITZER:  Very quickly, Your Honor.

9          THE COURT:  Okay.

10          MR. PITZER:  This does boil down to an issue of

11   credibility.

12          THE COURT:  It does.

13          MR. PITZER:  I think that there are a couple of things

14   that I would point out to the Court.  One of those is that

15   Ms. Bozanic or Bozanic or however it's pronounced, wrote, which

16   is now in evidence, a very laudatory letter or made a very

17   laudatory statement to the media about how Guy Phillippe was

18   one of the most honorable people she had ever represented.

19          Like his politics or hate his politics, she found him

20   to be honorable.  I think trust and honor go hand in hand.  The

21   reason I brought Mark O'Brien and Rachel Reese here today and

22   they were good enough to travel from Tampa on Mr. Phillippe's

23   behalf was to say to the Court that when he contacted them,

24   when they were contacted, he had one thing on his mind, do I or

25   don't I have an appeal filed and that they looked into it and

1      found out, no, you don't.

2           If he is an honorable man, which his lawyer who got to

3      know him apparently fairly well feels, is he the type of man

4      who would conduct that type of charade, and I think not.

5           THE COURT:  Anything else from the Government?

6           MS. KIRKPATRICK:  Your Honor, the only thing I would

7      add is that it seems pretty obvious that the defendant regrets

8      his plea and I believe that the fact that he didn't contact

9      another lawyer until September despite being under the belief

10     since June of no appearance I believe nine years sounded great

11     when he was looking at life but it didn't sound so great when

12     he entered into the Bureau of Prisons.  I think this is a

13     regret and, again, I would ask that the Court find his

14     testimony not credible.

15          THE COURT:  Okay.  Thank you.

16          Okay.  A lot of information.  I am going to take time

17     and look at the file, look at the transcript today, testimony,

18     and then make a decision in short order and let you know where

19     we stand.

20          MS. KIRKPATRICK:  Thank you, Your Honor.

21          THE COURT:  All rise.  The Court is in recess.

22          (Proceedings were concluded at 12:40 p.m.)

23

24

25

1
2
 C E R T I F I C A T E

3
4
        I hereby certify that the foregoing is an

5
accurate transcription of the proceedings in the

6
above-entitled matter.

7

8
December 26, 2018     /s/Patricia Diaz
DATE                  PATRICIA DIAZ, FCRR, RPR, FPR
9                     Official Court Reporter
                      United States District Court
10                    400 North Miami Avenue, 11th Floor
                      Miami, Florida 33128
11                    (305) 523-5178

12

13

14

15

16

17

18

19

20

21

22

23

24

25